596 F.Supp. 548 (1984)
GREAT SALT LAKE MINERALS AND CHEMICALS CORPORATION, a Delaware corporation, Plaintiff,
v.
John O. MARSH, Jr., Secretary of the Army of the United States of America; Lieutenant General Joseph K. Bratton, Chief of Engineers, U.S. Army Corps of Engineers; Brigadier General Donald J. Palladino, Division Engineer, South Pacific Division, U.S. Army Corps of Engineers; Colonel Arthur E. Williams, District Engineer, Sacramento District, South Pacific Division, U.S. Army Corps of Engineers; Scott M. Matheson, Governor, State of Utah; Temple A. Reynolds, Executive Director, Utah State Department of Natural Resources; Ralph Miles, Director, Utah Division of State Lands and Forestry, Utah Department of Natural Resources; Southern Pacific Transportation Company, Defendants.
William J. Colman, Plaintiff-in-Intervention.
No. C-84-0230A.
United States District Court, D. Utah, C.D.
June 2, 1984.
*549 *550 Dale A. Kimball, Patricia W. Christensen, Rooker, Larsen, Kimball & Parr, Salt Lake City, Utah, for plaintiff.
Frank J. Allen, Salt Lake City, Utah, for William J. Colman.
Joseph W. Anderson, Asst. U.S. Atty., Salt Lake City, Utah, Geoffrey Worstell, Deputy Dist. Counsel, Sacramento, Cal., Dallin W. Jensen, Michael M. Quealy, Asst. Attys. Gen., L. Ridd Larson, Ray, Quinney & Nebeker, Salt Lake City, Utah, for defendants.

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
ALDON J. ANDERSON, Chief Judge.
On May 25, 1984, the United States District Court for the District of Utah, Central *551 Division, the Honorable Aldon J. Anderson, Chief Judge, presiding, heard oral argument on plaintiffs' Motion for Preliminary Injunction. Plaintiff, Great Salt Lake Minerals and Chemicals Corporation, was represented by Dale A. Kimball, Patricia W. Christensen and Edwin Sieger. Plaintiff-in-intervention, William J. Colman, was represented by Frank J. Allen. The Corps of Engineers and other federal defendants were represented by Joseph W. Anderson and Geoffrey Worstell. Dallin W. Jensen and Michael M. Quealy represented the State of Utah, and L. Ridd Larson represented Southern Pacific Transportation Company. The court took the motion under advisement. The court, having examined the record of the administrative hearing before the Corps of Engineers, the memoranda of the parties, and having heard oral argument and testimony, hereby enters its order denying plaintiffs' Motion for Preliminary Injunction.

I. BACKGROUND
This is an action for judicial review, under the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702-706, of a decision by the United States Army Corps of Engineers ("Corps"), dated March 20, 1984, to issue a permit to the Utah State Department of Natural Resources, under Section 404 of the Clean Water Act, to discharge fill material into the Great Salt Lake in connection with a flood control project to breach the Southern Pacific Transportation Company ("Southern Pacific") Railroad Causeway across the Great Salt Lake.
The Great Salt Lake is divided into the North and South Arms by the Southern Pacific Railroad Causeway, constructed of rock and other fill material. The characteristics of the two arms of the lake differ in several respects. The surface of the North Arm is approximately 2.5 feet lower than that of the South Arm and a substantially greater concentration of salt and other minerals is present in the North Arm than in the South Arm. Breach of the causeway would result in an 18% reduction in the salinity of the North Arm (R. 8466 at 1332-1333) and is projected to result in an approximate 0.75 foot decrease in the elevation of the South Arm of the lake and an approximate 1.25 foot increase in the elevation of the North Arm of the lake. (R. 8466 at 181.)
The increase in the water level of the Great Salt Lake is unparalleled in this century. For a period of 13 years, beginning in 1963, the lake rose at an average rate of about 0.7 feet per year. Thereafter, the lake receded two feet and then leveled off. In the last year and a half the lake level has increased rapidly.
In response to the extraordinary rise in the level of the Great Salt Lake, the Utah Legislature, in its 1984 Budget Session, passed House Bill No. 30, which was subsequently signed by the Governor and became effective on March 29, 1984. The Legislature found that existing and anticipated extraordinary flooding conditions around the Great Salt Lake could be alleviated by breaching the Southern Pacific Causeway dividing the north and south arms of the lake and therefore authorized the Executive Branch to undertake such breach.
In anticipation of legislation authorizing the breach, the Utah State Department of Natural Resources submitted an application to the Corps on December 12, 1983, for a Section 404 dredge and fill permit, proposing to excavate a 300-foot breach of the causeway. Following notice, submission of evidence, a public hearing and investigation, the Corps issued the 404 permit to the State of Utah ("State"). The State engaged Southern Pacific to act as general contractor of the project. Southern Pacific soon began work on breaching the causeway.
Thereafter, Great Salt Lake Minerals & Chemicals Corporation ("GSL") filed a complaint in this court seeking (1) preliminary and permanent injunctive relief postponing and preventing the discharge of fill material into the Great Salt Lake in connection with the breaching of the causeway; (2) a declaratory judgment that the action by the *552 Corps in issuing the permit was arbitrary, capricious and an abuse of discretion, was not in accordance with law, was in excess of statutory authority and was without observation of procedures required by law; and (3) an order setting aside the Corps' decision to issue the permit. GSL filed its Motion for Preliminary Injunction on April 2, 1984.
William J. Colman ("Colman") subsequently filed a motion to intervene as a party plaintiff. Colman's complaint-in-intervention stated four causes of action. The court granted Colman's motion to intervene only as to the first cause of action which asserted generally the same claims as those advanced by GSL, differing only in the nature of the harm Colman claimed he would sustain as a result of the breach. Notwithstanding the fact the court denied Colman's motion to intervene as to his state law claims, Colman's counsel argued at the preliminary injunction hearing that the State's failure to comply with state law condemnation requirements was a taking of Colman's property without compensation and resulted in irreparable injury. The court does not have jurisdiction to hear Colman's state law claims and the prior ruling governs.
On May 18, 1984, the court held a prehearing conference on plaintiffs' motion for preliminary injunction wherein it was concluded that the court's review of the Corps' decision is limited to the narrow question of whether the Corps' action was arbitrary, capricious or an abuse of discretion. 5 U.S.C. § 706(2)(A). The focal point for this review is the administrative record of the Corps' action. The court did allow additional affidavits and testimony to be received on the question of irreparable injury, balance of hardships and public interest considerations. However, these affidavits and testimony do not go to the question of likelihood of success on the merits. For this determination, the court is limited to a review of the administrative record.
The court has previously ruled during oral argument that plaintiffs have standing to assert environmental claims, to the extent that such claims may be at issue in the case, even though the plaintiffs' interests may be principally economic. See National Helium Corp. v. Morton, 455 F.2d 650, 655 (10th Cir.1971); See also Realty Income Trust v. Eckerd, 564 F.2d 447, 452-543 (D.C.Cir.1977).

II. STANDARD OF REVIEW
The standard of review of the Corps' action is determined by § 706 of the Administrative Procedure Act, 5 U.S.C. § 706 (1982), which provides that a "reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions" found not to meet six separate standards. Some of these standards apply only in narrow, specifically limited situations. However, in all cases, agency action must be set aside if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action failed to meet statutory, procedural or constitutional requirements. 5 U.S.C. §§ 706(2)(A), (B), (C), (D) (1982). The parties agree that the court must apply the arbitrary and capricious standard of review as provided by § 706(2)(A) of the Administrative Procedure Act.
The United States Supreme Court explained the meaning of the arbitrary and capricious standard in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971):
Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.
Id. at 416, 91 S.Ct. at 823-824 (citations omitted).
*553 Section 706(2)(A) embodies a doctrine of judicial restraint. City Federal Savings & Loan Ass'n v. Federal Home Loan Bank Board, 600 F.2d 681, 688 (7th Cir.1979). The choice between lawful courses of action is entrusted to the Corps, not to the court. See Id.; SEC v. Chenery, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). If the Corps' decision to grant the 404 permit was a valid determination of policy or judgment, the court must not substitute its judgment for that of the Corps. The arbitrary and capricious standard of review is a highly deferential one which presumes the agency's action to be valid. Environmental Defense Fund, Inc. v. Costle, 657 F.2d 275, 283 (D.C.Cir.1981). The burden of overcoming this presumption is placed on the party challenging the agency's action. Id. Rather than substituting its judgment for that of the Corps, the court will presume that the Corps acted lawfully, and so conclude, unless a thorough inspection of the record yields no discernible rational basis for the Corps' action. See Motor and Equipment Manufacturers Association, Inc. v. EPA, 627 F.2d 1095, 1105 (D.C.Cir.1979), cert. denied, 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980).
In applying the arbitrary and capricious standard of review, the focal point will be a consideration of the administrative record. Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The court must be assured, from its examination of the record, that the agency's action was "based on a consideration of the relevant factors," Citizens to Preserve Overton Park v. Volpe, 401 U.S. at 416, 91 S.Ct. at 824; and that the agency "engaged in reasoned decisionmaking within the scope of its Congressional mandate." American Radio Relay League, Inc. v. F.C.C., 617 F.2d 875, 879 (D.C.Cir.1980). The agency must explain in the record the facts and policy concerns underlying its decisions and conclusions. However, the agency need not supply comprehensive explanations and record citations for every conclusion. Kennecott Copper Corporation v. E.P.A., 612 F.2d 1232, 1236 (10th Cir.1979). If the Corps gave reasoned consideration to the issues before it and reached a result which rationally flowed from this consideration, the standard of review mandates affirmance of the Corps' decision. See Environmental Defense Fund, Inc. v. Costle, 657 F.2d at 283; Motor and Equipment Manufacturers Ass'n, Inc. v. E.P.A., 627 F.2d at 1106.

III. INJUNCTIVE RELIEF
The criteria for preliminary injunctive relief under Rule 65 of the Federal Rules of Civil Procedure is set forth in Lundgrin v. Claytor, 619 F.2d 61, 63 (10th Cir.1980). A preliminary injunction to preserve the status quo pending a final resolution of the rights of the parties will issue if the movant establishes a
(1) substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.
If the movant fails to establish any of these four requirements a preliminary injunction will not issue. See Kenai Oil & Gas, Inc. v. Interior Dept., 671 F.2d 383, 385 (10th Cir.1982). With these factors in mind, plaintiffs' contentions that they are entitled to preliminary injunctive relief will be examined.

A. LIKELIHOOD OF SUCCESS ON THE MERITS
In order to prevail on the merits, the plaintiffs must establish that the decision of the Corps to issue the 404 permit was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and that the procedure employed by the Corps in arriving at its decision was not in conformity with statutory and regulatory requirements.
*554 GSL contends the Corps' determination that there are "no overriding national factors of the public interest" which would preclude issuance of the permit was arbitrary and capricious in that the Corps failed to give serious consideration to the adverse national economic and environmental impacts of the project and failed to consider and follow the concerns and requirements expressed in its own regulations (33 C.F.R. Part 320-324) and other applicable statutes, such as, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, the Fish and Wildlife Coordination Act, 16 U.S.C. § 661 et seq.; and the Endangered Species Act, 16 U.S.C. § 1531 et seq.
The Corps' procedures provide that the decision to issue a permit will be based on the probable impact of the proposed activity and its intended use on the public interest. Evaluation of the project's impact on the public interest involves a careful weighing of relevant factors and the decision should reflect the national concern for both protection and utilization of important resources. See 33 C.F.R. § 320.4(a)(1).
GSL has advanced two major arguments, one environmental and the other economic, to support its claim that it is likely to prevail on the merits of this action. Colman has joined in GSL's motion.

1. Environmental Concerns

GSL contends the Corps failed to make adequate findings on critical environmental issues, particularly the effects of the project on endangered species, failed to engage in meaningful consultations with other federal agencies and gave inadequate notice to affected persons of the environmental implications of the state's application.

a. Effects on Wildlife

The Corps considered the effect of the breach on wildlife and their habitat, including the impact on endangered peregrine falcons and bald eagles. The breach of the causeway will flood the Locomotive Springs Waterfowl Management area. (R. 8466 at 181.) The record indicates that Locomotive Springs is one of the areas used as a hunting area by the bald eagle and the peregrine falcon. (R. 8466 at 1495.) However, the record does not indicate that flooding of Locomotive Springs would have any permanent or significant impact on these birds or their critical habitat. Furthermore, the record indicates that any adverse impact to Locomotive Springs could be offset by benefits the breach would bring to South Arm marshlands. (R. 8466 at 1496.) The majority of marshlands surrounding the Great Salt Lake are on the South Arm. South Arm marshes and other areas throughout the state and nation host the bald eagle and peregrine falcon. In addition, the comments from Fish and Wildlife Service and the Utah Department of Wildlife Resources do not indicate that the breach would have a significant adverse impact on either of these species. (R. 8231 at 31-33.) Given the potential offset of any adverse impacts on the North Arm marshes and wildlife by the reduced flooding of the more extensive South Arm marshes, which also provide a possible habitat for endangered species, the Corps' finding of only minor environmental impacts can be understood.
GSL also argues the breach will adversely impact on the white pelican rookery on Gunnison Island. The record indicates the Corps considered the potential impact on the pelicans. The Environmental Assessment ("EA") states that only a short-term reduction in the overall pelican population is likely, with the population returning to normal within several years. (R. 8466 at 182.) The EA also indicates that while pelicans nest on the North Arm, their primary feeding areas are in the South Arm marshes. (R. 8466 at 182.) The Corps concluded that lowering the lake level by the breach would improve feeding conditions for adult pelicans. (R. 8466 at 182.) In addition, the Corps conditioned the permit on the State taking appropriate measures to discourage pelicans from nesting in areas on Gunnison Island which may be *555 inundated as a result of the breach. (R. 8466 at 85.)

b. Notice

GSL also claims the public notice materially failed to comply with the Corps' regulations. (33 C.F.R. § 325.3.) The court is not persuaded that notice was inadequate to "give a clear understanding of the nature and magnitude of the activity to generate meaningful comment." 33 C.F.R. § 325.3(a). The Corps also issued press releases and there was extensive media coverage. The public was fully alerted to the proposed breach project and the opportunity to comment thereon.
Public notice of the permit application was given twice. The Corps initially gave notice in June, 1983, but the State thereafter withdrew its permit application. The State subsequently resubmitted its permit application and the Corps again gave notice on December 30, 1983. This second public notice clearly references the earlier public notice. The first notice provided that "All factors which may be relevant to the proposal will be considered" and expressly included considerations of fish and wildlife, flood damage prevention and water quality. (R. 8231 at 13-14.) These two notices, as well as press releases issued by the Corps, inform the public of the nature of the project and its potential effects as known to the Corps at that time.
The public notice is a document prepared early in the permit process and issued within 15 days of receipt of the permit application. 33 U.S.C. § 1344(a); 33 C.F.R. § 325.2(d)(1). The adequacy of the public notice must be judged based on the relevant information available to the Corps at the time notice was issued. The Corps is not required to include detailed conclusions and findings in the notice. The notice is sufficient if it provides for meaningful comment and apprises the public of the relevant issues.
Plaintiffs' assertions that the public notice tainted the proceedings by not informing the public of the true consequences of the breach, thereby keeping public participation and opposition to a minimum, are not borne out by the record. GSL, as well as other members of the public, were apprised of the relevant issues and had extensive opportunities to comment on the proposed breach.

c. Consultation with Other Agencies

The record indicates that the Corps consulted with Fish and Wildlife Services, the Environmental Protection Agency and state agencies. (R. 8231 at 13-14, 23-24 and 30-33.) The consensus of opinion was that there were no significant environmental impacts.

d. Conclusion

The Corps' decision reflects a thorough review of the potential environmental impacts that could be incurred as a result of the breach. The reasonable conclusion is that the Corps did take the "hard look" required. Plaintiff argues, nonetheless, that the EA failed to provide sufficient information to justify the Corps' determination that no Environmental Impact Statement ("EIS") would be required. However, the EA need not contain or restate every detail or consideration that came before the Corps. The court believes the Corps' conclusion, that there were no adverse environmental impacts sufficient to require an EIS, was based on a consideration of the relevant factors and that the decision rationally flowed from this consideration. The Corps determined the impacts of the breach to be primarily socio-economic not requiring an EIS. The plaintiffs have not established that the Corps' decision on environmental impacts was arbitrary and capricious.

2. Economic Concerns

Plaintiffs assert that the Corps did not sufficiently explain the basis for its decision on the economic issues presented and cannot point to facts in the record to support such decision.

*556 a. National Impacts of Breach

The movants claim the Corps failed to adequately consider the serious national economic consequences of the breach proposal and that such failure was an abuse of discretion.
The Corps did not seriously question GSL's claim that the proposed breach and the resultant dilution of North Arm brines would make it economically infeasible to continue operations. (R. 8466 at 568-581.) The evidence indicates the breach could result in GSL ceasing operations. GSL currently accounts for about 40 percent of United States Sulfate of Potash ("SOP") production. (R. 8466 at 535.) The demise of GSL could result in the unemployment of 300 people, and could have a negative impact on the nation's agriculture, through loss of SOP. The Corps, nevertheless, concluded that the demise of GSL would not be of national consequence.
The court believes that the Corps' decision of no overriding national interest flows rationally from the record. The Corps considered GSL's economic claims in detail. GSL presented its economic claims at a public hearing (R. 8466 at 1636-1654), and filed a written statement with the Corps. (R. 8466 at 562 et seq.) GSL's economic data was evaluated by Corps economists and included in a special economic assessment attached as Appendix 7 to the EA wherein the economic issues raised by GSL were specifically addressed. (R. 8466 at 183, 529-539.) Furthermore, in its Statement of Findings, the Corps notes that all available material had been considered, including that submitted by GSL. (R. 8466 at 76.)
Unless the economic issue is one of overriding national importance, it will not serve as the basis for a denial of a 404 permit. See 33 C.F.R. §§ 320.1(a)(1); 320.4(a)(1), and (j)(2) and (4). The Corps' economists questioned GSL's assertion that it would be forced to cease operations, but for purposes of assessing the national impacts presumed that the adverse effects of the breach would cause GSL to cease operations. Nevertheless, the economists concluded that the socio-economic effects of GSL's demise would only be local in nature; that resulting unemployment would be alleviated by other employment opportunities (R. 8466 at 535); and that the loss of the market-dominant GSL in the western United States and resulting modest increases in SOP prices would likely make it profitable for other domestic producers of SOP to enter the market. (R. 8466 at 536.)
The Corps concluded that the national impacts on the SOP market would be minimal because there are alternative suppliers, both domestic and foreign, which can meet the demand. (R. 8466 at 183.) This is rationally based on the Corps' economic assessment. (R. 8466 at 536.) The economic assessment was based on interviews with GSL executives and others, and a review of documents submitted by the state and GSL. The Corps' decision was made after a thorough consideration of the evidence. The fact GSL and others may have arrived at a different conclusion does not require a finding that the Corps was arbitrary and capricious. The Corps' determination was a valid and reasoned consideration of the relevant factors. Plaintiffs have failed to carry the burden of establishing that the Corps' determination on national impacts was arbitrary and capricious.

b. The Control Gate Issue

GSL argues the Corps abused its discretion in failing to condition issuance of the permit on the installation of control gates so as to enable the North Arm brines to be rejuvenated once the danger of flooding had subsided. GSL claims the Corps simply deferred to the State on this issue and did not take an independent look at the economic consequences as required by 30 C.F.R. § 320.4(a)(1).
The Corps took a hard look at the control gate proposal and decided it would not be proper to condition the permit on the installation of control gates. The Corps' Statement of Findings (R. 8466 at 76) notes that the State Legislature considered the *557 control gate issue and refused to pass legislation requiring the construction of control gates in connection with the breach. The Statement of Findings recognizes that the State's position was they should not be responsible for salinity control or management of the two arms of the lake. GSL argues the protocol it proposed for operation of the control gates would not require the State to become involved in salinity control. The Corps' response was that the State analyzed the protocol for operation of the gates and determined it would adversely affect flood control operations. (R. 8466 at 97.) Moreover, the Corps found that the existence of the causeway created an artificial condition on the Great Salt Lake whereby salinity in the North Arm would be greater than in the South Arm. Industries that developed facilities based on this artificial condition did so at their own risk on the realization that changes could be made in the artificial condition that would affect salinity concentrations. (R. 8466 at 98.)
Under the circumstances, the court believes the Corps cannot be faulted in refusing to require the State to guarantee the future operation of GSL's business by conditioning the permit on the installation of control gates, especially given the expressed legislative refusal to include control gates in the breach project and the Corps' conclusion that no overriding national interests were present.

3. Conclusion

The record shows that the Corps thoroughly analyzed the environmental and economic data submitted by all parties and found no overriding national factors of public interest which would preclude the issuance of a permit. 33 C.F.R. § 320.4(j)(4). In the absence of such factors, a permit will generally be issued following receipt of a favorable state determination provided the applicable statutes have been considered and followed. While the Corps' economic analysis shows the breach may have an overall negative economic benefit, the analysis cannot fully measure the significant benefits in flood control and does not take into account the advantages of the breach in the event of catastrophic increases in the lake level. At levels in excess of 4210 feet, a 0.75 foot decrease in the level of the South Arm would produce large benefits. (R. 8466 at 533.) It was the state's expressed policy to take emergency action to alleviate flooding by breaching the causeway, and to avoid the realistic threat of catastrophe. In the absence of overriding consequences of national importance, the Corps' decision to issue the 404 permit was not arbitrary, capricious or an abuse of discretion.
The movants have therefore failed to establish a likelihood of success on the merits. Based on this failure alone, the court must deny the preliminary injunction.

B. ESTABLISHMENT OF OTHER PREREQUISITES FOR PRELIMINARY INJUNCTIVE RELIEF
The requirement that the movants will suffer irreparable injury unless the injunction issues has been satisfactorily established. It appears both GSL and Colman run a substantial risk of being put out of business as a result of the breach. The record indicates the movants' operations may no longer be economically viable if the causeway is breached and that the parties will likely shut down operations. A person forced out of business may be considered irreparably harmed thereby. See Valdez v. Applegate, 616 F.2d 570, 572 (10th Cir. 1980).
However, even though the threat of injury to GSL and Colman is significant and irreparable, the scales of public interest weigh more heavily in favor of the breach.
The decision to breach the Southern Pacific Railroad Causeway was a result of the exercise of the sovereign power of the State of Utah to undertake emergency flood control measures to attempt to meet, not only the threat of imminent flooding in the areas surrounding the Great Salt Lake, but also the possibility of continued catastrophic rises in the level of the lake. In the wake of unparalleled rapid rises in the South Arm of the lake, the State understandably *558 acted rapidly to attempt to counter the threat.
The record indicates that each one foot rise in the level of the lake would inundate vast areas of surrounding land because of the shallow rise in the valley floor. For example, the 5.2 foot increase in the level of the lake from September, 1982, to July, 1983, inundated about 171,000 acres or 267 square miles. (R. 8466 at 1043.) Each additional foot of rise would translate into millions of dollars of damage. (R. 8466 at 1068.) Lakeside industries, highways, railroads, public facilities, homes, waterfowl management areas and recreation areas would sustain significant damages. (R. 8466 at 1068.) At higher lake elevations, the breach would yield substantial benefits and prevent even more significant damage. (R. 8466 at 553.)
Plaintiffs contend the breach cannot be completed in time to have any impact on this year's peak elevation. This is probabilistic, since the lake may peak later than normal due to the wet weather pattern of this spring. However, even if the lake peaks before the breach is accomplished, the breach will have substantial short-term and long-term benefits. The breach will have the effect of rapidly lowering the level of the South Arm, thereby reclaiming land flooded at the peak. The breach will also create long-term evaporation benefits as the flow of less saline South Arm water into the North Arm will hasten evaporation, causing a faster receding of lake levels. (R. 8466 at 77, 992.)
The breach of the causeway is the announced public policy of the State of Utah as declared by the Legislature and approved by the Governor. The legislation to breach the causeway was passed after considerable study and debate. The Legislature expressly declared that it was in "the public interest and a public purpose" to breach the causeway because of the "importance of counteracting the anticipated threat to life, health and property in general and to public lands, major transportation routes and other public facilities." (R. 8466 at 998-999.) Thus, the public interest has been expressed by the representative of the public, the State Legislature.
Notwithstanding the significant damages to the movants, the breach of the causeway will serve the public interest. Plaintiffs cannot equate the public interest with their interests. Given the clear expression of the legislative and executive branches of the State of Utah and the continuing risk of serious flood damage that could be alleviated by the breach, the court concludes that the movants have not established that the injunction "would not be adverse to the public interest." Lundgrin v. Claytor, 619 F.2d at 63. Therefore, even if the movants had established a likelihood of success on the merits, the injunction would be denied because of its adverse impact on the public interest.

IV. ORDER
Based on the foregoing consideration of the factors bearing on the request for preliminary injunctive relief, the court enters this order denying a preliminary injunction to the movants.