PUBLIC CITIZEN HEALTH
RESEARCH GROUP, et al.,
Appellants,

v.

COMMISSIONER, FOOD & DRUG
ADMINISTRATION, and Aspirin
Foundation of America, Inc.

No. 83–1302.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 7, 1983.
Decided July 27, 1984.

Katherine A. Meyer, Washington, D.C., with whom William B. Schultz and Alan B. Morrison, Washington, D.C., were on the brief, for appellants.

Gerald C. Kell, Atty., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., J. Patrick Glynn and Margaret A. Cotter, Attys., Dept. of Justice, Washington, D.C., and Thomas Scarlett, Chief Counsel, Washington, D.C., and Forrest T. Patterson and Ann H. Wion, Associate Chief Counsel, Food & Drug Administration, Rockville, Md., were on the brief, for appellee Commissioner, Food & Drug Administration.

Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, and Craig R. Lawrence and Patricia J. Kenney, Asst. U.S. Attys., Washington, D.C., entered appearances for appellee Commissioner, Food & Drug Admin.

R. Bruce Dickson, Washington, D.C., with whom Donald L. Morgan, Washington, D.C., was on the brief, for appellee Aspirin Foundation of America, Inc. Michael A. Wiegard, Washington, D.C., entered an appearance for appellee Aspirin Foundation of America, Inc.

Ronald F. Kehoe, Boston, Mass., of the bar of the Supreme Judicial Court of Massachusetts, pro hac vice, by special leave of court, with whom Henry T. Goldman and Michael X. Morrell, Washington, D.C., were on the brief, for amicus curiae Committee on the Care of Children, urging affirmance.

Before WRIGHT and TAMM, Circuit Judges, and SWYGERT,* Senior Circuit Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

In this case we must decide whether the failure to date of the Food and Drug Administration[1] to promulgate a rule requiring certain warnings on labels of aspirin products violates the prohibition of "unreasonably delayed" agency action in the Administrative Procedure Act. 5 U.S.C. § 706(1) (1982) ("[t]he reviewing court shall * * * compel agency action unlawfully withheld or unreasonably delayed"). Based on considerable scientific evidence suggesting that children with influenza or chicken pox who take aspirin face a greatly increased risk of developing Reye's Syndrome, a rare but often fatal disease, appellant Public Citizen Health Research Group (HRG) and others seek a court order man-

dating appropriate warning labels on aspirin products.

The "misbranding" provision of the Food, Drug and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq. (1982), requires drug labels to bear "such adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health * * *." 21 U.S.C. § 352(f)(2). Claiming that this statutory norm requires aspirin products to bear a label warning of the risk of Reye's Syndrome, HRG first petitioned FDA to promulgate a regulation ordering such labeling immediately. Initially FDA responded favorably and took preliminary steps toward issuance of such a rule, but the agency turned back midstream and decided that further study was needed before such a rule should be promulgated. As of this time FDA is still investigating the issue. Dissatisfied with the pace of FDA's decisionmaking, HRG brought suit in the District Court seeking an injunction ordering FDA to promulgate a rule requiring labeling. On cross-motions for summary judgment, the District Court invoked the ripeness and finality doctrines and declined to order FDA to promulgate such a rule at this stage. Because we find that a judicial resolution of the substantive issues that HRG's request presents is inappropriate at this stage in the administrative process, we affirm the District Court's decision to refrain from adjudicating the labeling question. The paramount public health concerns that this case raises compel us, however, to remand to the District Court for a determination whether FDA has "unreasonably delayed" resolution of the labeling question, see 5 U.S.C. § 706(1), and if so to order FDA to commence rulemaking on the labeling issue immediately and to reach a decision as expeditiously as is possible consistent with sound decisionmaking.

---

* Of the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

1. The Secretary of Health and Human Services is responsible for administration of the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq.

(1982). This responsibility has been delegated to the Commissioner of the Food and Drug Administration pursuant to 21 C.F.R. § 5.10 (1983).

## I. BACKGROUND

### A. *The Link Between Aspirin and Reye's Syndrome*

Reye's Syndrome is a rare but deadly childhood disease that afflicts between 600 and 1,200 young people each year in this country. *See Advance Notice of Proposed Rulemaking, Labeling for Salicylate-Containing Drug Products*, 47 Fed.Reg. 57886 (December 28, 1982), Joint Appendix (JA) 449. The disease usually affects children recovering from viral infections such as influenza or chicken pox. Initial symptoms include severe vomiting, irritability, and lethargy, and the disease rapidly progresses in many cases to convulsions and coma. Death occurs in 20 to 30 percent of all cases, and permanent brain damage occurs in many others. *Id.*

Though the exact cause of Reye's Syndrome is unknown, the rapid onset of the disease in children recovering from influenza or chicken pox has prompted some scientists to suggest that a toxic agent interacting with the viral infection might be a causative factor in the disease. Many people in the medical community have for at least 20 years suspected that this causative agent might be salicylates—a class of chemicals that includes aspirin. Several early studies suggested that children with influenza or chicken pox who are treated with aspirin have an increased risk of developing Reye's Syndrome. *See id.* at 57886–57887, JA 449–450 (summarizing early studies).

This mounting evidence led the Center for Disease Control (CDC), an agency within the Department of Health and Human Services, to cooperate with the state health departments of Arizona, Ohio, and Michigan in conducting four case-control[2] studies to investigate possible association between salicylates and the onset of Reye's Syndrome. All four studies documented that children with Reye's Syndrome were significantly more likely to have taken aspirin during antecedent illnesses than were children in the control group who had had the same illnesses. *See id.* at 57887–57896, JA 450–459. After reviewing the data in three of the four state studies (Arizona, Ohio, and the first of two Michigan studies), CDC published on November 7, 1980 the following conclusion: "The results of these studies suggest that during certain viral illnesses the use of salicylates * * * may be a factor in the pathogenesis of Reye syndrome." *CDC Morbidity and Mortality Weekly Report* (November 7, 1980) at 539, JA 10. CDC went on to recommend that "parents should be advised to use caution when administering salicylates to treat children with viral illnesses * * *." *Id.*

At this time CDC also convened a "working group" of outside scientific consultants to evaluate the four state studies. After a year of study the CDC-sponsored working group concluded that "there is strong epidemiologic evidence for an association between the occurrence of Reye's syndrome and the prior ingestion of salicylate containing medication." *Report of Reye's Syndrome Working Group* (November 12, 1981) at 1, JA 12. Though noting possible methodological flaws in the studies, the working group found it "unlikely that these limitations * * * could totally explain the strength of the association or the consistency of the observation in the various studies." *Id.* Based on this evaluation,

> [i]t was the consensus of the working group that until the nature of the association between salicylates and Reye's syndrome is clarified, the use of salicylates should be avoided, when possible, for children with varicella infections [chicken pox] and during presumed influenza outbreaks. * * *

*Id.* at 3, JA 14.

### B. *HRG's Petition for FDA Action*

In light of this evidence, and consequent calls from CDC for warnings about the

---

2. A case-control study attempts to identify retrospectively potentially relevant differences between Reye's Syndrome cases and control children who are similar to the cases in all relevant respects except the presence of Reye's Syndrome. The methodology is described in more detail in *Advance Notice of Proposed Rulemaking*, 47 Fed.Reg. 57887, 57888 (1982), JA 450, 451.

association between aspirin and Reye's Syndrome, appellant Public Citizen Health Research Group, a nonprofit public interest group that, *inter alia*, seeks to identify health risks in over-the-counter drugs, petitioned the Food and Drug Administration to require a warning label on aspirin-containing products. On February 10, 1982 Dr. Sidney M. Wolfe of HRG orally asked the Deputy Commissioner of FDA to require a label warning of the association between salicylates and Reye's Syndrome. *See* Affidavit of Sidney M. Wolfe, M.D. (July 15, 1982), JA 163–164. By letter dated March 9, 1982 HRG formally petitioned FDA "to immediately change the labelling on all aspirin-containing products to warn against use by children with chicken pox or during the winter because of the link between aspirin and Reye's Syndrome." *Letter of Sidney M. Wolfe, M.D., to Mark Novitch, M.D., Associate Commissioner of FDA* (March 9, 1982), JA 33. Filing of a citizen's petition is authorized by 21 C.F.R. § 10.30 (1983).

By letter dated April 8, 1982 HRG supplemented its March 9th petition by outlining the legal basis for its claim that FDA must act immediately to require a warning label on products containing aspirin. HRG based its demand primarily on Section 331 of FDCA, 21 U.S.C. § 331, which prohibits the sale in interstate commerce of any "misbranded" drug. A drug is "misbranded" if its labeling is "misleading in any particular" or "unless its labeling bears * * such adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health * * *." *Id.* § 352(a) & (f)(2). According to appellant HRG, the evidence linking aspirin to Reye's Syndrome made clear that aspirin was "misbranded" within the meaning of Section 352 and a warning label was therefore required. *See Letter from Sidney M. Wolfe et al. to Arthur Hull Hayes, M.D.* (April 8, 1982) at 1–2, JA 35–36. In this letter HRG also stated that if FDA did not respond by April 30, 1982, HRG would consider its petition denied. *Id.* at 2, JA 36.

## C. *FDA's Response*

FDA answered HRG's petition on April 23, 1982. Labeled an "interim response," the letter stated:

FDA has established a special working group to review and analyze the data on this issue. Until this information is reviewed, a decision cannot be made concerning what action, if any, is appropriate. Therefore, we can neither grant nor deny your petition at this time. However, if the data under review demonstrate a connection between aspirin and Reye's Syndrome, the agency will act expeditiously to protect the public health.

*Letter from James C. Morrison, Acting Assistant Director for Regulatory Affairs, Bureau of Drugs, FDA, to Sidney M. Wolfe, M.D.* (April 23, 1982), JA 43. The letter also noted that under FDA regulations the agency had 180 days to respond to citizen petitions, and that FDA's failure to respond by April 30, 1982 could not be construed as a denial of the petition. *See id.*

Apparently dissatisfied with FDA's response, HRG brought suit in the District Court on May 17, 1982, seeking an order directing FDA to require an appropriate warning label on products containing aspirin or, alternatively, an order requiring FDA to respond to the merits of HRG's petition within 30 days. *See* Complaint for Declaratory and Injunctive Relief, JA 45.

Meanwhile, FDA took some tentative steps toward action on HRG's petition. The FDA working group (mentioned in the April 23rd letter) presented its findings at a day-long meeting of experts and government officials on May 24, 1982. As the Secretary of HHS later described the group's findings, "It was the consensus of the scientific experts * * * that the new analysis [the four state studies] supported the earlier evidence of salicylates and Reye Syndrome association and was sufficiently strong to warrant warning health professionals and parents." *See HHS News Release* (June 4, 1982) at 2, JA 159. At about this time the American Academy of Pediatrics (AAP) presented FDA with a report of

AAP's Committee on Infectious Diseases. After review of the four state studies, the AAP report concluded that

> the consensus of the Committee is that there is a high probability that the administration of aspirin contributes to the causation of Reye syndrome. In balancing this probability (the risk) with the benefits of aspirin, it is the opinion of the Committee that aspirin should not be prescribed under usual circumstances for children with varicella [chicken pox] or those suspected of having influenza * *.
> * * *

*Special Report, Aspirin and Reye Syndrome,* 69 PEDIATRICS 810, 811–812 (June 1982), JA 155, 156–157.

On June 4, 1982 the Secretary of HHS, Richard Schweiker, announced his opinion that "medical experts have concluded that the use of salicylates such as aspirin in children with influenza and chickenpox and certain other viral infections has been sufficiently associated with Reye Syndrome to warrant warning physicians and parents." *HHS News Release, supra,* at 1, JA 158. He ordered FDA to undertake an extensive education campaign, directed FDA to "require that the labeling of [aspirin] products be changed to advise against their use in these childhood diseases," *id.,* and requested the Surgeon General of the United States Public Health Service to issue an appropriate advisory. The Surgeon General did so on June 11, 1982. Enumerating the evidence linking aspirin and Reye's Syndrome, the Surgeon General announced that he "advises against use of salicylate and salicylate-containing medications for children with [influenza and chicken pox]." *Surgeon General's Advisory on the Use of Salicylates and Reye Syndrome, CDC Morbidity and Mortality Weekly Report* (June 11, 1982) at 289, JA 161.

The next actions of importance occurred in the fall of 1982. On September 20th the Secretary announced that he had signed a proposed regulation that would have required labels on aspirin products warning of the association between salicylates and Reye's Syndrome.[3] *HHS News Release* (September 20, 1982), JA 189. The proposed regulation was not, however, immediately published in the Federal Register. As HRG discovered by a letter dated October 4, 1982, which FDA labeled a "second interim response," publication had been delayed pending review by the Office of Management and Budget (OMB) pursuant to Executive Order 12291. *See Letter from James C. Morrison to Sidney M. Wolfe, M.D.* (October 4, 1982) at 2, JA 203.

As of November 1982 FDA still had not published the proposed regulation in the Federal Register. On the 10th of that month FDA received from the Executive Committee of the American Academy of Pediatrics the following statement:

> In June, 1982, the American Academy of Pediatrics published a statement by the Committee on Infectious Diseases alerting pediatricians to the possible association of aspirin administration and Reye's Syndrome. We stated then, and continue to believe, that there should be cautious use of any antipyretic medication in the treatment of influenza or chicken pox. However, at the present time, we do not feel that labeling aspirin-containing preparations as being contraindicated in these illnesses is in the best interest of children or the practice of pediatrics. We believe labeling should be delayed until more conclusive evidence of the association of aspirin administration and Reye's Syndrome is shown by further investigation. We urge that support be provided as soon as possible for appropriate investi-

---

**3.** For nonprescription drugs the proposed warning label read: "Warning: This product contains a salicylate. Do not use in persons under 16 years of age with flu or chickenpox unless directed by your doctor. The use of salicylates to treat these conditions has been reported to be associated with a rare but serious childhood disease called Reye Syndrome." For prescrip- tion drugs the proposed warning label read: "Drugs of this class, salicylates, have been reported to be associated with the development of Reye Syndrome in children under 16 years of age with chickenpox, influenza and influenza-like infections." *HHS News Release* (September 20, 1982), JA 189–190.

gators, including government agencies, to address this important question. *Reye Syndrome, Statement of Executive Board of American Academy of Pediatrics* (November 8, 1982), JA 243. On the same day a group calling itself the Committee on the Care of Children (CCC) sent a letter to the President and Vice President of the United States, the Vice President's counsel in charge of the Task Force on Regulatory Affairs, the Director of OMB, the Secretary of HHS, the Commissioner of FDA, and other government officials. In this letter CCC strongly urged that FDA abandon the proposed aspirin labeling rule as "unwise and unwarranted." The letter went on to suggest that the American Academy of Pediatrics had changed its position *at the urging* of CCC and to note that "members of this Committee have worked with members of the Academy and have reviewed the available data. After this review, the Academy has concluded that no warning labels on aspirin products are warranted at this time." *Letter from Neil L. Chayet* (November 10, 1982) at 2, JA 246. CCC is funded by Schering-Plough and Sterling Drug, two of this nation's largest manufacturers of aspirin products.[4]

On November 18, 1982 the Secretary of HHS reversed course and withdrew the proposed rule. According to an HHS news release, the Secretary decided, "following a review of the recent statement by the American Academy of Pediatrics' Executive Board, [that] new government-supported studies are necessary to help resolve a scientific dispute over the reported link between Reye Syndrome and salicylate-containing drugs." *HHS News Release* (November 18, 1982), JA 254.

Though it withdrew the labeling rule, FDA did continue its campaign to educate physicians and parents about the possible risks of Reye's Syndrome associated with aspirin. FDA's next step was to issue an advance notice of proposed rulemaking on December 28, 1982. That notice stated that FDA was "considering proposing" a rule requiring aspirin warning labels and was proceeding by way of an *advance* notice "so that the agency will have the benefit of a broad range of views early in the rulemaking process * * *." *Advance Notice of Proposed Rulemaking, supra,* 47 Fed.Reg. 57886, JA 449. As of this time FDA has taken no further action with respect to a rule requiring labeling.

## D. *The District Court Decision*

As noted, HRG filed a suit in the District Court on May 17, 1982, seeking an order mandating FDA to require appropriate warning labels on aspirin products. The parties cross-moved for summary judgment. On March 14, 1983 the District Court entered summary judgment for FDA in a brief opinion. Though acknowledging that HRG had made a strong case that labeling was required under FDCA, the court was reluctant to interfere with the agency's initial determination of that matter. In essence, the court held that FDA's delay in reaching a decision was not unreasonable and that considerations of ripeness and lack of finality precluded review at this stage. The court thus dismissed HRG's complaint without prejudice to renewal of the challenge after a final decision by the agency. *Memorandum Opinion* (March

---

4. The record indicates that strong pressure was brought to bear on the American Academy of Pediatrics by the Committee on the Care of Children. In response to the statement of AAP's Executive Board reversing its recommendation to FDA on the labeling question, both the present chairman and the former chairman of AAP's Committee on Infectious Diseases resigned from the Committee. In his letter of resignation the former chairman, Dr. Edward A. Mortimer, Jr., stated as one ground for his resignation the following: "I feel that the Academy has now set a most unfortunate and potentially dangerous precedent for itself and for other public or quasi-public advisory bodies in terms of responding to outside pressures. I find this to be unacceptable." *Letter of Dr. Edward A. Mortimer, Jr. to Dr. James E. Strain* (November 17, 1982), JA 251. He added, "I, as one who has spent literally hundreds of hours studying this matter, feel that the Board made this decision in cursory fashion without adequate examination of the facts or permitting its technical advisory committee to have an adequate hearing in this matter." *Id.* at 2, JA 252.

28

14, 1983), JA 465–471. HRG appeals this decision.

## II. ANALYSIS

HRG contests FDA's decision to promulgate an advance notice of proposed rulemaking instead of issuing a rule immediately requiring a Reye's Syndrome warning label for products containing aspirin. According to HRG, the agency's approach was contrary to APA's prohibition of "unreasonably delayed" agency action. *See* 5 U.S.C. § 706(1) ("[t]he reviewing court shall * * * compel agency action unlawfully withheld or unreasonably delayed * * "). The burden of the argument as HRG frames it is that since 1982 the accumulated scientific evidence and the findings of FDA and other HHS officials to the effect that this evidence links salicylates and Reye's Syndrome, *see* Part I–C *supra,* has compelled the conclusion that aspirin products are "misbranded" as a matter of law under FDCA. A drug is "misbranded" if its label does not bear "adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health." 21 U.S.C. § 352(f). Because aspirin products are "misbranded" under this definition, the argument goes, the statute places FDA under a mandatory duty to require warning labels or to remove aspirin products from the market, and FDA's delay in the face of this duty is "unreasonable" under Section 706(1) of the APA.

Cast in these terms, HRG's plea demands a great deal of the court. Requesting a judicial decision that aspirin is misbranded as a matter of law, HRG invites the court either to decide itself that aspirin products without a Reye's Syndrome warning label are misbranded or to hold that the FDA and HHS statements and actions to which HRG points are authoritative agency findings that aspirin products are misbranded. Because we are not certain which of these two claims HRG is making, we will analyze both possibilities.

If we construe HRG's argument as a request for a judicial determination *in the first instance* that aspirin products are misbranded as a matter of law, then we must decide whether such a determination is warranted at this time. The statutory term "misbranded" denotes a legal category defined by Congress in FDCA, and whether an item is "misbranded" is thus a legal issue. Nonetheless, application of this legal standard to particular facts requires a determination whether a drug "may be dangerous," and such a determination necessarily involves subtle scientific judgments about a drug's risks and benefits. Generally, under FDCA, Congress has entrusted the Secretary of HHS, and her delegate FDA, with the authority to make such expert policy judgments in the first instance, and in most cases a court properly stays its hand until FDA has made an initial ruling.

FDA must decide in the first instance, for example, whether a product previously found "misbranded" in a judicial condemnation proceeding under 21 U.S.C. § 332 has been relabeled so as to conform to FDCA requirements. *United States v. An Article of Device ... Diapulse,* 650 F.2d 908, 910 (7th Cir.1981) ("This statutory scheme is sensible and proper because courts are not expert on the medical and scientific issues which must be explored in order to produce accurate labeling." (internal quotation marks and citation omitted)); *United States v. Allan Drug Corp.,* 357 F.2d 713, 719 (10th Cir.1966). Similarly, FDA has authority to decide in the first instance whether a product is a "new drug" and thus subject to the strictures of 21 U.S.C. § 355. *See Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 652, 93 S.Ct. 2488, 2493, 37 L.Ed.2d 235 (1973) ("where no such administrative determination has been made and the issue arises in a district court in enforcement proceedings, it would be commonplace for the court to await an appropriate administrative declaration before it acted"). This principle should apply with equal force in the present circumstances. Whether the association between salicylates and Reye's Syndrome is sufficiently strong to require a

Given this allocation of responsibility in the statutory scheme, HRG's request for initial judicial ruling on the misbranding issue amounts to an attempt to bypass the administrative process. Principles embodied in the requirement that a plaintiff exhaust administrative remedies suggest that such immediate judicial intervention would be precipitous. When Congress has allocated to an agency the power to decide certain questions in the first instance, "it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise." *McKart v. United States*, 395 U.S. 185, 194, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969). We have viewed this exhaustion doctrine as serving four primary purposes: it ensures that persons do not flout established administrative processes and thereby advances Congress' intent in establishing the processes; it protects the autonomy of agency decisionmaking; it aids judicial review by permitting factual development in an agency proceeding; and it serves judicial economy by avoiding needless repetition of administrative and judicial factfinding and by perhaps avoiding the necessity of any judicial involvement if the parties successfully vindicate their claims before the agency. *Andrade v. Lauer*, 729 F.2d 1475, 1484 (D.C. Cir.1984).

Though the exhaustion requirement is not jurisdictional in nature, *see id.* and cases there cited, and should not be applied blindly when the interests that the doctrine protects would not be served, *id.*, we hold that the exhaustion requirement applies to HRG's present request that the court decide the "misbranding" issue at this point.

Whether aspirin is sufficiently dangerous to require a warning label is a factual question demanding the medical expertise that FDA possesses and we lack. And the issue is currently the subject of an ongoing FDA rulemaking procedure; judicial resolution of the issue would encourage disregard for the procedures Congress has established to resolve such questions and would undermine the autonomy of the administrative decisional process. Further, considerations of judicial economy militate against judicial resolution of the dispute at this point. HRG may well convince FDA that a regulation mandating labeling is needed, in which case the judicial action sought would be unnecessary. Thus, if HRG is viewed as asking for initial judicial resolution of the "misbranding" issue, the exhaustion doctrine demands that this request be rejected so that the administrative process can run its course as Congress intended.[5]

If, alternatively, HRG is viewed as arguing that certain statements and actions of FDA and HHS, *see* Part I–C *supra*, constitute a binding *agency* finding of misbranding, we face somewhat different issues. This argument requires us to hold that earlier decisions favoring a labeling rule bind the agency while later decisions favoring more study are void. Viewed in this way, HRG's claim does not amount to an effort to bypass the administrative process altogether, but would require this court to intervene in the administrative process prior to its completion.

The facts do evoke some sympathy for HRG's claim. The FDA working group concluded in May 1982 that studies had shown a link between aspirin and Reye's Syndrome sufficiently strong to require warnings. Secretary Schweiker of HHS announced in June 1982 that he would require warning labels, and in September signed a proposed regulation that would have mandated such labeling. *See* Part I–C *supra*. In light of this consistent

---

5. We do not consider this to be a case in which exhaustion of administrative remedies would be futile. We have no indication that the agency has closed its mind to the position HRG advocates. Rather, FDA is actively considering whether a labeling rule is needed.

course of conduct in response to the scientific evidence, the Secretary's about-face in November 1982 gives us pause, particularly because HHS and FDA appear to continue to view the evidence linking salicylates and Reye's Syndrome as sufficiently strong to justify an education campaign alerting physicians and parents to the danger. Neither the substance of the decision to require further study nor the circumstances leading to the decision, *see* note 4 *supra*, suffice, however, to permit us to leapfrog back over the Secretary's decision that further scientific study is needed and hold the agency to its preliminary decision to promulgate a labeling requirement at this time.

■ Refusing to bind the agency to these preliminary findings, the District Court properly focused on considerations of ripeness and finality. The ripeness doctrine, which requires a court to evaluate the fitness of issues for judicial review and the hardship to the parties from withholding review, "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and * * protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). APA's requirement that agency action be "final" before a court reviews the substance of that action, 5 U.S.C. § 704, similarly serves to prevent premature judicial review of administrative action. The requirement of finality permits "the agency an opportunity to correct its own mistakes and to apply its expertise" and prevents "piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary." *FTC v. Standard Oil Co. of California*, 449 U.S. 232, 242, 101 S.Ct. 488, 494, 66 L.Ed.2d 416 (1980). The two doctrines are intended to further slightly different interests. Ripeness is primarily concerned with ensuring that issues are in a posture fit for *judicial* review. *Gulf Oil Corp. v. U.S. Dep't of Energy*, 663 F.2d 296, 311 (D.C.Cir.1981). Finality is primarily concerned with protecting the integrity of the *administrative* process. *FTC v. Standard Oil Co. of California, supra*. Notwithstanding this difference in emphasis, the doctrines tend to converge in that both are meant to prevent premature judicial intervention in the administrative process.

■ Though these doctrines limit judicial action, they do not do so in a precise and inflexible way. The Supreme Court has instructed us that we should apply the finality requirement in a "flexible" and "pragmatic" way. *See Abbott Laboratories, supra*, 387 U.S. at 149–150, 87 S.Ct. at 1515–16. And this finality requirement is intimately bound up with the "fitness" prong of the ripeness inquiry. In determining whether a case is ripe the court must decide whether it is "*sufficiently* final * * * that we would have no interest in postponing review," *Midwestern Gas Transmission Co. v. FERC*, 589 F.2d 603, 618 (D.C.Cir.1978) (emphasis added), and when disinclined to find finality, "we must then weigh this consideration against the immediate impact of the actions on the challengers, and whether that impact is so harmful that present consideration is warranted." *Id.* Even this flexibility will not usually suffice, however, to permit judicial resolution of substantive issues that are the subject of an ongoing agency proceeding. *See Abbott Laboratories, supra*, 387 U.S. at 148, 87 S.Ct. at 1515 (ripeness doctrine "protect[s] the agencies from judicial interference until an administrative decision has been formalized"); *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1180 (D.C.Cir.1979) (Leventhal, J., concurring) (finality doctrine permits judicial intervention in ongoing agency proceeding only in cases of clear violation of statutory mandate, *see Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), or structural flaws precluding fair procedure "and not requiring *in any way* a consideration of interrelated aspects of the merits" (emphasis in original)).

In deciding whether an issue was sufficiently final to be fit for review, *Abbott Laboratories* drew a distinction between "definitive" agency regulations, which are reviewable even if not yet enforced, 387 U.S. at 151, 87 S.Ct. at 1516, *see id.* at 149, 87 S.Ct. at 1515 ("no claim is made here that further administrative proceedings are contemplated"), and "tentative" agency positions, which are not usually reviewable. *Id.* Review of tentative agency positions on substantive questions severely compromises the interests that ripeness and finality notions protect. The agency is denied full opportunity to apply its expertise and to correct errors or modify positions in the course of a proceeding, the integrity of the administrative process is threatened by piecemeal review of the substantive underpinnings of a rule, and judicial economy is disserved because judicial review might prove unnecessary if persons seeking such review are able to convince the agency to alter a tentative position. Such considerations weigh strongly when the court is asked to rule on a factual question particularly within the agency's bailiwick as opposed to a purely legal question within the primary competence of the courts. *See id.* at 149, 87 S.Ct. at 1515. In sum, because of a lack of finality, "fitness" considerations will invariably weigh heavily against review in these circumstances.

Though a court must also evaluate hardship that might result from delaying review, *Abbott Laboratories, supra,* 387 U.S. at 149, 87 S.Ct. at 1515; *Midwestern Gas, supra,* 589 F.2d at 618, these considerations will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions. The type of hardship that has motivated the Supreme Court to authorize pre-enforcement review in certain cases is aptly captured by Professor Davis; he describes this hardship as "a dilemma for a private party who must choose between disadvantageous compliance and risking serious penalties." 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE 369 (2d ed. 1983). This hardship is produced by the delay between an agency's promulgation of a standard of conduct and its efforts to enforce the standard against a regulated entity. When a standard has been promulgated and a regulated entity is faced with the "dilemma" that Professor Davis identifies, judicial review is both possible—because a definitive agency position susceptible of review exists—and appropriate—because delay in review causes hardship to the regulated entity. When a petitioner seeks review of a tentative agency position, a different calculus of interests arises. The claimed hardship results not from delay in enforcement of an established standard, but from delay in establishment of a standard. Without a doubt the harm that such delay causes can in a particular case be grave, especially when the agency is charged with protection of the public health. But in general judicial review of the substantive merits of a tentative agency position is not an appropriate means to remedy the harm. A tentative agency position will not generally be in a form susceptible of review under Section 10 of the APA, and, perhaps more importantly, as we have stressed review is at odds with fundamental notions of administrative law that generally require the agency to resolve substantive issues in the first instance.[6]

We recognize that the focus of the doctrines of ripeness and finality is predominantly on the interests of the agency and the regulated entity, and the *Abbott Labor-*

6. The *Abbott Laboratories* "fitness" and "hardship" approach is perhaps best viewed as adjusting the interests of the regulating agency and the regulated entity within certain boundaries. In deciding whether an agency position is sufficiently fit for review, the court decides whether an established standard can be evaluated effectively outside of the specific factual context that will arise when it is applied in a particular case. When the existence of the established standard places the regulated entity in the dilemma that Professor Davis describes the court must decide whether the benefits of review in a specific factual context are outweighed by the hardship that might be caused by delaying review until the standard is enforced against the regulated entity. This evaluation applies, however, only when there is some established standard that can be reviewed by the court.

*atories* approach is directed at ameliorating the potential hardship to those subject to impending enforcement of an established norm. The doctrines simply do not accommodate the interests of those whom regulations are meant to benefit or protect. Nonetheless, review of an agency's tentative position on a substantive issue in an ongoing agency proceeding is as a general matter antithetical to basic notions of the proper allocation of functions in our administrative state.

■ Having said that, we note that courts are certainly not without power to address the interests of a regulatory beneficiary (properly before the court) when unwarranted agency delay prejudices those interests. "At some point administrative delay amounts to a refusal to act, with sufficient finality and ripeness to permit judicial review." *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1100 (D.C.Cir.1970). In these situations—when delay is extremely lengthy or when "exigent circumstances render it equivalent to a final denial of petitioners' request," *id.* at 1098—the court can undertake review as though the agency had denied the requested relief and can order an agency to either act or provide a reasoned explanation for its failure to act. When agency recalcitrance is in the face of a clear statutory duty or is of such magnitude that it amounts to an abdication of statutory responsibility, the court has the power to order the agency to act to carry out its substantive statutory mandates. *Adams v. Richardson*, 480 F.2d 1159 (D.C.Cir.1973) (*en banc*) (*per curiam*); *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 594–595 (D.C.Cir.1971).

And even when agency delay or recalcitrance does not rise to a level that justifies either of the above courses, APA empowers the court to evaluate the pace of the agency decisional process and to order expedition if the pace lags unreasonably. Section 555(b) of APA requires an agency to "proceed to conclude a matter presented to it" within "a reasonable time," 5 U.S.C. § 555(b), and Section 706(1) explicitly authorizes a court to "compel agency action * * * unreasonably delayed." *Id.* § 706(1). These provisions give courts authority to review ongoing agency proceedings to ensure that they resolve the questions in issue within a reasonable time. *Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1158 (D.C.Cir. 1983); *Potomac Electric Power Co. v. ICC*, 702 F.2d 1026, 1034 (D.C.Cir.1983); *MCI Telecommunications Corp. v. FCC*, 627 F.2d 322, 340 (D.C.Cir.1980). As the *Potomac Electric Power Co.* court put it, "[T]here must be a 'rule of reason' to govern the time limit to administrative proceedings. Quite simply, excessive delay saps the public confidence in an agency's ability to discharge its responsibilities and creates uncertainty for the parties, who must incorporate the potential effect of possible agency decisionmaking into future plans." 702 F.2d at 1034. *See Nader v. FCC*, 520 F.2d 182, 207 (D.C.Cir.1975). Public health concerns must enter the calculus under this rule of reason; "[d]elays that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake." *Public Citizen Health Research Group v. Auchter, supra*, 702 F.2d at 1157. In sum, the law does provide means by which the interests of regulatory beneficiaries can be protected from the adverse effects of delays in agency action.

■ Applying these principles to the dispute before us, we conclude that ripeness and finality considerations prevent us from holding that FDA is bound to its position of June-September 1982 that aspirin products are misbranded and require Reye's Syndrome warning labels. To accept HRG's position we would have to find that the May 1982 conclusions of the FDA working group, the June 1982 statement of Secretary Schweiker calling for a labeling rule and an education campaign, and the September 20, 1982 decision of the Secretary to sign a proposed regulation requiring labeling, *see* Part I–C *supra*, amount to a definitive, binding agency position on the misbranding issue. The facts of this case

simply will not support a finding that this agency position is "definitive" in the *Abbott Laboratories* sense. The working group recommendations and the June statement of the Secretary are facially preparatory. The Secretary's decision in September to sign the proposed regulation was, in fairness, probably considered by the Secretary to be a final statement of position at the time. But even that action cannot be considered definitive in the sense that "[no] further administrative proceedings are contemplated." *Abbott Laboratories, supra,* 387 U.S. at 149, 87 S.Ct. at 1515. The regulation had to pass under the censorial eye of OMB, whose review might well have prompted revision. The proposed regulation had not been published and could not have taken effect until some time after publication. Most importantly, whatever the Secretary's view in September 1982 as to the finality of his actions, supervening events have overtaken the position. The Secretary's November 1982 decision not to promulgate the proposed rule and his December 1982 decision to issue an Advance Notice of Proposed Rulemaking indisputably supersede the September decision to sign the proposed regulation as far as the Secretary is concerned. Thus as of the time the District Court ruled on the motions for summary judgment the agency's September position had been rendered tentative by subsequent events. The only remaining factual hook on which HRG could plausibly hang its argument that FDA has made a definitive finding of misbranding is the agency decision to continue its education campaign to warn physicians and parents about the risk of Reye's Syndrome associated with aspirin. The agency itself rejected this view: "Evidence of a potential public health risk may be sufficient to make public education appropriate but may not necesarily [*sic*] justify requiring revised product labeling." *Advance Notice of Proposed Rulemaking, supra,* 47 Fed. Reg. at 57897, JA 460. In light of the agency's explicit statement that it does not consider the findings made to justify an education campaign sufficient to justify a decision that a drug is misbranded, the fact of the education campaign cannot be taken as reflective of a definitive agency position on the misbranding question.

An examination of the course of agency decisionmaking in this case leaves us with the firm conviction that as a factual matter the position of FDA and HHS from June-September 1982 was not definitive. HRG points to no countervailing factors such as a provision in FDA's enabling statute or in its regulations that might suggest that the statements and actions at issue here should be considered binding or definitive in any sense, and we have found no such statutory or regulatory provision. Nor is this a case like *Environmental Defense Fund, Inc. v. Ruckelshaus, supra,* in which the agency has made—and not recanted—specific findings and then failed to set in motion a procedural mechanism that the statute mandates upon such findings. 439 F.2d at 594–595. Lacking any such warrant in the facts of this case or in statute or regulation for binding the agency to its June-September position, our only basis for holding the agency to this position and voiding the subsequent decisions to require further study would be our own substantive judgment that the early position was correct and the later position erroneous. Such a judgment would require us to evaluate the scientific evidence before the agency and conclude that this evidence mandated a finding that aspirin products are misbranded. That, quite obviously, is precisely the question now before the agency in an ongoing proceeding, and is precisely the genre of question the resolution of which Congress has entrusted to the agency in the first instance.

At bottom, a judicial decision binding the agency to its June-September position and ordering immediate promulgation of a labeling rule would impermissibly infringe the interests that the ripeness and finality doctrines are intended to protect. We would "den[y] the agency an opportunity to correct its own mistakes and apply its expertise." *FTC v. Standard Oil Co. of California, supra,* 449 U.S. at 242, 101 S.Ct. at 494. Considerations of judicial economy

would also be undermined in that our "piecemeal review * * * upon completion of the agency process might prove to have been unnecessary." *Id.* Perhaps most importantly, the court would displace expert agency judgment on an issue of medical fact with inexpert judicial judgment. Such judicial action is inappropriate in advance of a definitive agency resolution of the issue. Thus, whether HRG's claim is viewed as one for initial judicial determination of the misbranding issue or as one for binding the agency to its June-September 1982 position, the claim would require premature resolution of a substantive issue properly left to the agency in the first instance. We thus affirm the District Court's refusal to address the substance of the misbranding issue at this time.

That determination does not, however, close the book on this case. As we noted, the reviewing court possesses ample means to protect regulatory beneficiaries whom HRG represents from adverse effects of agency delay or recalcitrance. Though we do not find this to be a case in which agency delay amounts to denial of HRG's petition, *see Environmental Defense Fund, Inc. v. Hardin, supra,* or a case in which agency recalcitrance amounts to an abdication of statutory responsibility, *see Adams v. Richardson, supra,* we do think this case raises serious questions with respect to whether FDA is resolving within "a reasonable time" the issues HRG has raised. *See* 5 U.S.C. § 706(1).

When the public health may be at stake, the agency must move expeditiously to consider and resolve the issues before it. *Public Health Citizen Research Group v. Auchter, supra,* 702 F.2d at 1158. In response to a request that the court "compel agency action * * * unreasonably delayed" pursuant to 5 U.S.C. § 706(1), the court should review the pace of the agency decisional process to ensure that it is not lagging unreasonably in light of the nature and extent of public health considerations. *Id.* Of course the court must consider not only the public health interests but the constraints on the agency in allocating its investigatory and enforcement resources as

well. And the reasonableness of the delay "must be judged 'in the context of the statute' which authorizes the agency's action." *Id.* at 1158 n. 30 (*quoting Nat'l Congress of Hispanic American Citizens v. Marshall,* 626 F.2d 882, 888 (D.C.Cir. 1979)). In some circumstances agency delay may be so egregious that it constitutes unreasonable delay for APA purposes as a matter of law. *See id.* (appellate court ordered expedition on basis of facts found by District Court).

In the present case, as in *Auchter,* there are strong indications that the agency, by reversing course and issuing an advance notice of proposed rulemaking, "has embarked on the least responsive course short of inaction." *Id.* at 1153. The record evidence indicating that industry pressure precipitated this reversal, *see* note 4 *supra,* is particularly troubling in that the pace of agency decisionmaking may jeopardize the lives of children. We stress, though, that the District Court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed." When an agency is charged with the administration of a statutory scheme whose paramount concern is protection of the public health, the pace of agency decisionmaking must account for this statutory concern. As this court said in *Auchter,* "Delays that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake." 702 F.2d at 1157. The current record strongly suggests that the pace of agency decisionmaking is unreasonably dilatory. All scientific evidence in the record points to a link between salicylates and Reye's Syndrome, and the agency has itself credited this evidence at least to the extent of conducting an education campaign to warn physicians and parents of the potential risks that salicylates pose.

Nonetheless, the question of whether agency action has been unreasonably delayed is generally one best addressed by the District Court in the first instance in situations like the present one. Because the District Court did not consider the ex-

tent of and possible justifications for the agency delay in the present case, we hold that a remand is appropriate to permit the District Court to take evidence and rule initially on whether the agency response to HRG's petition for a warning label on aspirin products has been "unreasonably delayed." If the court finds unreasonable delay, it must fashion an appropriate remedy, which may include ordering rulemaking to begin immediately and proceed expeditiously, and ordering periodic reports to the court concerning the pace of the rulemaking.

## III. CONCLUSION

 Because this case touches on many difficult issues concerning the availability and timing of judicial review of agency action, we shall attempt to make clear in conclusion exactly what we have and have not decided. In this case we do not mean to limit in any way the principle that agency decisions in response to citizen petitions are generally reviewable; we merely address the timing of that review. Thus, except for the narrow category of cases in which judicial review is specifically precluded under the terms of APA, *see* 5 U.S.C. § 701, when an agency denies a citizen petition requesting agency action the court can review the agency's reasons for denial. If they do not meet the requirements of Section 10 of APA, 5 U.S.C. § 706, the court can order the agency to either act or provide a reasoned explanation for its refusal to act. *Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *WHHT, Inc. v. FCC*, 656 F.2d 807 (D.C.Cir.1981); *Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031 (D.C.Cir.1979). These principles apply equally when agency inaction or delay is tantamount to denial of the petition. *Environmental Defense Fund, Inc. v. Hardin, supra,* 428 F.2d at 1100. And when an agency's enabling statute mandates certain investigatory procedures upon particular factual findings, the court can order an agency to invoke such a procedure when the agency has made the requisite findings in response to a citizen peti-

tion, *Environmental Defense Fund, Inc. v. Ruckelshaus, supra,* or when a citizen petition presents the agency with factual data *indisputably* sufficient to trigger the statutory investigative procedures, *Environmental Defense Fund, Inc. v. U.S. Dep't of HEW,* 428 F.2d 1083, 1089–1090 (D.C.Cir.1970). In extreme situations, if an agency fails to act after having had full opportunity to consider the substantive merits of an issue in response to a citizen petition, the court can order the agency to comply with a clear statutory mandate to exercise jurisdiction over a particular area, *see Hotel Employees Local No. 255 v. Leedom,* 358 U.S. 99, 79 S.Ct. 150, 3 L.Ed.2d 143 (1958), or to enforce a substantive norm, *see Adams v. Richardson, supra.* In this case we merely affirm that substantive review of agency decisions not to act should not proceed until the agency has had reasonable opportunity to resolve the substantive issues involved.

 We hold that *in this case* the principle of respect for the integrity of the administrative process—as embodied in the exhaustion, finality, and ripeness doctrines—precludes judicial review, prior to a definitive agency resolution, of the substantive merits of whether aspirin products are misbranded unless they carry a label warning of Reye's Syndrome. We therefore affirm the District Court's decision to decline to address this issue at this point. We also hold, however, that when a petitioner asks the court to "compel agency action * * * unreasonably delayed," as in the present case, the court should evaluate the pace of the agency decisional process. In deciding whether the pace of decision is unreasonably delayed, the court should consider the nature and extent of the interests prejudiced by delay, the agency justification for the pace of decision, and the context of the statutory scheme out of which the dispute arises. We stress that the present case places on the District Court a grave responsibility to ensure that the pace of agency action does not jeopardize the lives of hundreds of children. We therefore remand for a determination of

36

whether FDA and HHS are unreasonably delaying resolution of HRG's petition for a rule requiring a Reye's Syndrome warning label on aspirin products.

*Affirmed in part and remanded in part.*