**NEWPORT GALLERIA GROUP, An Affiliate of the Pyramid Companies, Plaintiff,**

v.

**Michael R. DELAND, et al., Defendants,**

**Massachusetts Audubon Society, et al., Defendants-Intervenors.**

**Civ. A. No. 85-2747.**

United States District Court, District of Columbia.

Sept. 25, 1985.

R. Robert Popeo, Michael S. Gardner, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, Mass., R. Sarah Compton, Carolyn Kay Weeder, McDermott, Will & Emery, Washington, D.C., for plaintiff.

Lawrence R. Liebesman, U.S. Dept. of Justice, Land & Natural Resources Div., Environmental Defense Section, Washington, D.C., for defendants.

Michael J. Bean, Environmental Defense Fund, Inc., Washington, D.C., James T.B. Tripp, Environmental Defense Fund, New York City, Peter Shelley, Armond M. Cohen, Conservation Law Foundation of New England, Inc., Boston, Mass., Hope M. Babcock, National Audubon Soc., Jerry Jackson, National Wildlife Foundation, Washington, D.C., for defendants-intervenors.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiff Newport Galleria Group of the Pyramid Companies ("Pyramid") seeks to enjoin defendant United States Environmental Protection Agency ("EPA") from conducting public hearings pursuant to section 404(c) of the Clean Water Act, 33 U.S.C. § 1344(c) (1982), on Pyramid's proposed construction of a regional shopping mall on certain wetlands located in Attleboro, Massachusetts. EPA and defendant-intervenors challenge Pyramid's right to a preliminary injunction, and move for dismissal of the suit for lack of jurisdiction. Because the Court finds that EPA's initiation of the section 404(c) proceedings is neither unlawful nor a final agency action, it is constrained to dismiss for lack of subject matter jurisdiction.

## I. Background

Pyramid seeks to build an enclosed regional shopping mall on 80 acres of land situated in Attleboro, Massachusetts, approximately 50 acres of which are red maple wetlands known locally as Sweeden's Swamp. Pyramid is not the first to propose such a mall for Sweeden's Swamp. The Edward J. DeBartolo Corporation, Pyramid's immediate predecessor in interest in the land, had earlier sought and failed to obtain permission from the Massachusetts Department of Environmental Quality Engineering ("DEQE") to locate a shopping center at the site. In 1982, following the DEQE denial, DeBartolo sought an adjudicatory hearing, which was still pending in late 1983 when Pyramid assumed control of the project. The DEQE subsequently authorized the project in a final order issued in March, 1985.

Prior to obtaining state approval, Pyramid also applied to the United States Army Corps of Engineers ("Corps") in August, 1984, for a permit to fill in Sweeden's Swamp. Section 404(a) of the Clean Water Act authorizes the Corps to issue permits for the discharge of dredged or fill material into navigable waters at specified disposal sites. 33 U.S.C. § 1344(a) (1982). Section 404(b) provides that, subject to subsection (c), permits are to be based on the application of guidelines developed by the Administrator of the EPA in conjunction with the Secretary of the Army. Id. at § 1344(b) (1982). Those guidelines are set out at 40 C.F.R. § 230 (1984) ("Guidelines"). During the permit process, the EPA, the Corps and the United States Fish and Wildlife Service ("FWS") examined Sweeden's Swamp and found it to be a relatively undisturbed example of a deciduous forested New England wetland, providing a habitat for small mammals, song-birds, reptiles, amphibians, and several species of birds during the migratory period. The three agencies concluded that, even with on-site mitigation, Pyramid's project would result in significant habitat losses. In addition, the EPA notified Pyramid that, under the 404(b) Guidelines, Pyramid bore the burden of

demonstrating that no other less environmentally damaging sites were available for its project.[1] Concerns over the loss of habitation, and dissatisfaction with Pyramid's conclusion that no other practicable alternatives existed, eventually led both the EPA and the FWS to recommend denial of the permit in their official comments to the Corps. Similar concerns prompted the Corps to notify Pyramid in early 1985 that denial of the 404 permit was "imminent". Declaration of Douglas A. Thompson, Exhibit K.

On May 2, 1985, Colonel Carl B. Sciple, Division Engineer of the Corps' New England Regional Division, forwarded his recommendation on Pyramid's permit application to Major General John F. Wall, then Director of Civil Works at Corps Headquarters in Washington, D.C. General Wall had earlier directed Colonel Sciple to submit his recommendation for review. Colonel Sciple proposed that Pyramid's permit be denied. General Wall, however, overturned that decision, and on May 31, 1985, directed Colonel Sciple to prepare a notice of intent to issue the permit and to reconcile his findings to conform with the instructions from Washington. On June 28, Colonel Sciple issued the notice of intent and the reconciled documentation. The notice set forth a series of conditions Pyramid must meet before it can begin alteration of Sweeden's Swamp. Chief among these is the creation of an off-site mitigation project, or artificial swamp, to replace the wetlands lost to the shopping center. The notice requires that Pyramid locate a mitigation site, complete hydrological studies and habitation evaluation, and develop plans and specifications for the project. No significant construction of the mall is to commence until the man-made swamp is functioning to the satisfaction of the Corps' Division Engineer. The proposed permit does not specify the size of the new swamp or its location, and it allows removal of substrate from Sweeden's

Swamp in order to develop the artificial wetlands.

On July 23, 1985, EPA's Regional Administrator ("RA") Michael R. Deland informed the Corps and Pryamid that he was initiating proceedings under section 404(c), and thereby suspending issuance of the permit. It is this action that Pyramid challenges as illegal and seeks to enjoin.

## II. *Discussion*

■ Section 404(c) provides, in pertinent part, that the EPA Administrator

> is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site ... whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas ..., wildlife, or recreational areas.

33 U.S.C. § 1344(c) (1982). Regulations issued under section 404(c) set forth the rather broad standards the Administrator is to apply in determining when to exercise this statutory veto power. They state that where "the Regional Administrator *has reason to believe* after evaluating the information available to him ... that an 'unacceptable adverse effect' *could* result ... he may initiate [§ 404(c) proceedings]." 40 C.F.R. § 231.3(a) (1984) (emphasis supplied). In essence, Pyramid contends that, as a matter of law, the RA cannot have any reason to believe that any adverse effect could possibly result from its project; that as a result, the RA's initiation of the section 404(c) proceedings is unlawful; and that therefore, the initiation of these proceedings is final agency action that this Court may review and enjoin.

Before turning to the specifics of Pyramid's arguments, it is worth noting the structure and plain language of section 404. As Pyramid correctly argues, under section 404(b), primary responsibility for

---

**1.** The Guidelines provide that where a proposed project "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not 'water

dependent'), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3) (1984).

the issuance of permits rests, in the first instance, with the Corps. Section 404(b), however, is expressly made subject to the EPA Administrator's veto power set out in section 404(c). Pyramid characterizes this power as "extraordinary, and therefore highly restricted," and claims that as such it may be exercised *"only if* the Regional Administrator has reason to believe" that unacceptable adverse effects could result from the proposed project. Plaintiff's Motion for Preliminary Injunction ("Plaintiff's Motion") at 21 (emphasis supplied). Pyramid's narrow view of the RA's authority under section 404(c), however, finds no support in the statute. That section authorizes the RA to withdraw a permit *"whenever* he determines, *after notice and opportunity for public hearings,* that [the project] will have an unacceptable adverse effect" on any of the five designated resource areas. 33 U.S.C. § 1344(c) (1982). Nothing in section 404(c) suggests that this power is extraordinary or highly restricted. Quite the contrary, the statute sets out no threshold requirements for the *initiation* of section 404(c) proceedings whatsoever: the sole specific limitation—the finding of an "unacceptable adverse effect"—applies only to actions the RA may take *after* the notice and hearing process, not before. The conditions placed on the RA's initiation of section 404(c) proceedings, such as they are, appear only in the regulations quoted above. As noted previously, they are broad, requiring only that the RA "[have] reason to believe ... that an 'unacceptable adverse effect' *could* result" from a given project. 40 C.F.R. § 231.3(a) (1984) (emphasis supplied).

Unable to point to any statutory language or legislative history in support of its claim that the RA's section 404(c) powers are highly restricted, Pyramid relies on the fact that the EPA has commenced proceedings under this section "on only seven

or eight occasions" since passage of the Act. Plaintiff's Motion at 21. This fact hardly compels the conclusion, as Pyramid seems to suggest, that the EPA understands its powers to be severely restricted; the infrequent use of section 404(c) may simply be the result of a regulatory likemindedness between the EPA and the Corps. The Court need not speculate, however, as it is enough to conclude that the relatively infrequent use of section 404(c) powers, without more, does not convert a broadly defined authority into an extraordinary and highly limited one.

In short then, Congress gave the EPA wide discretion to determine when to initiate proceedings under section 404(c). It is against this backdrop that Pyramid's claim of an illegal initiation of section 404(c) proceedings must be judged.

### A. *Practicable Alternative Issue*

Pyramid argues that no other practicable alternative sites are available to it as a matter of law, and thus the RA cannot possibly have any reason to believe otherwise.[2] It rests its argument on the 404(b) Guidelines, which state

[i]f it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

40 C.F.R. § 230.10(a)(2) (1984). Pyramid argues, plausibly, that under the Guidelines, property owned by another may not be considered "available" for purposes of determining practicable alternatives. The only site identified by the RA as a possible alternative in this case is already owned by a competing developer, thus, Pyramid claims, there are no practicable alternatives available to it as a matter of law.

Indeed, it would be extraordinary if Congress granted the EPA a veto power over the Corps' permit decisions, but precluded it from reconsidering those issues the Corps considered in deciding to grant the permit in the first place.

---

**2.** Pyramid goes so far as to suggest that the EPA may not revisit the issue of practicable alternatives after the Corps has reached its decision. Plaintiff's Motion at 22. Once again, Pyramid points to nothing in the statute, regulations or legislative history to justify such a restriction.

The difficulty with Pyramid's argument, and indeed, the underlying flaw in Pyramid's decision to bring suit at this juncture, is that this Court simply cannot decide those questions that Pyramid characterizes as "purely legal" on the present record. The RA has held no hearings nor has he compiled any administrative record on the practicable alternatives issue; rather, he has simply decided to investigate the question. Yet Pyramid would have the Court rule that based on the Corps' ultimate finding that no alternatives are available, the RA is precluded, as a matter of law, from entertaining doubts about the Corps' conclusion. This the Court is not prepared to do. In promulgating the section 404(c) Guidelines, the EPA noted that the RA's "preliminary determination [to initiate proceedings] merely represents a judgment that the matter is worth looking into." 44 Fed.Reg. at 58,078 (1979). The Corps' conclusion that no alternatives are available to Pyramid is hardly a sufficient basis for ruling, as a matter of law, that the RA could not possibly believe the issue is worth investigating. Section 404(c) would be a curious veto power, indeed, if, as Pyramid suggests, courts could prevent the EPA from reviewing those very findings upon which the Corps based its decision to issue the permit. See note 2, *supra.*

It is true that the section 404(c) Guidelines require that the RA base his "reason to believe" determination on "the information available to him." 40 C.F.R. § 231.3(a) (1984). This does not limit the RA, however, to only that information presented by the Corps. Moreover, in the present case the RA had before him Colonel Sciple's original recommendation of denial, which included the " 'No Build' alternative". Draft Statement of Findings and Environmental Assessment at 5. While Pyramid may not view this as a particularly attractive alternative, there is nothing to suggest that the RA may not consider it when deciding to initiate section 404(c) proceedings. In fact, in promulgating the 404(c) regulations, the EPA stated that "[o]f course, even where there is no alternative available, and 'vetoing' the site means

stopping a project entirely, the loss of the 404(c) resources may still be so great as to be 'unacceptable.'" 44 Fed.Reg. at 58,078 (1979). Thus it appears that, whether or not Pyramid could obtain another site for its mall, the RA was entitled to conduct proceedings under section 404(c) to determine whether the project should be barred altogether. Finally, at oral argument, government counsel argued that the EPA and the Corps have taken different views with respect to the meaning of "availability" for section 404(c) purposes, and that this policy dispute should be decided after hearings and public debate, not on an incomplete record.

For all these reasons, the Court is simply unable to rule, as a matter of law, that the RA could not possibly have had reason to believe that no other practicable alternatives exist. The statute and regulations grant the RA broad discretion in determining when to initiate section 404(c) proceedings, and on the present record the Court is unable to find that he abused that discretion.

B. *The Unacceptable Adverse Effect Issue*

Similarly, Pyramid contends that the RA cannot possibly have reason to believe that any unacceptable adverse effects could result from its project, since the Corps found that as a result of the artificial swamp, the project will produce a "net benefit to the aquatic environment." Statement of Findings and Environmental Assessments ("Corps' Findings") at 25. Pyramid has agreed not to touch Sweeden's Swamp until a "blue ribbon panel" certifies that the artificial swamp is functioning satisfactorily. Thus, it contends, no harm could possibly flow from issuance of the permit, since Sweeden's Swamp will remain unaltered until the mitigation project is successfully completed.

While Pyramid's arguments have a certain logical appeal, they are premised once again on a tortured construction of the statute. In essence, Pyramid claims that the EPA is bound by the Corps' findings

when exercising its section 404(c) veto power. As discussed above, this is not the case. Presumably, the Corps only issues permits when it believes that it is environmentally safe to do so; if the section 404(c) veto is to have any meaning at all, the EPA must be able to disagree with the Corps' conclusions. Certainly it is entitled to initiate proceedings under section 404(c) if it believes a matter is worth "looking into." It would be a rare case where a court could confidently say that the RA could not possibly believe that the findings of the Corps were open to question and therefore that further investigation was improper.

Here, the RA had ample reason to initiate section 404(c) proceedings. While Pyramid trumpets the Corps' ultimate findings of a net benefit, it conveniently overlooks the fact that Colonel Sciple, the person who conducted the actual investigation of Pyramid's permit application, recommended that the permit be denied, and submitted detailed findings to support that recommendation. In addition, the EPA and FWS urged denial of the permit in their official comments to the Corps. Clearly then, there is disagreement among the respective agencies as to the environmental effects of the proposed mall. Pyramid's contention that, as a matter of law, the RA could not possibly believe that the project could result in any unacceptable adverse effects is simply untenable.

Similarly, the fact that Pyramid has agreed not to touch Sweeden's Swamp until a blue ribbon panel certifies that its man-made swamp is fully operative does not preclude the RA from initiating section 404(c) proceedings. The panel itself has not been chosen[3] and, more importantly, the criteria it will use in determining whether the artificial swamp is "functioning satisfactorily" have not been articulated. Under these circumstances, the Court cannot rule, as a matter of law, that the RA cannot possibly believe that unacceptable adverse effects could result from such an ill-defined mitigation project. To

do so would in effect allow a permit applicant to divest the EPA of its section 404(c) veto power and turn it over to a private panel of the applicant's own choosing. The Court declines to re-write the statute in such a fashion.

Finally, Pyramid argues that the RA cannot possibly entertain doubts about the value of artificial wetlands, and therefore cannot initiate section 404(c) proceedings to investigate the subject. Plaintiff supports this contention with an affidavit submitted by several artificial wetlands experts who state that artificial swamps have been successfully created for decades and thus "[t]here is simply no question about the ability of Pyramid to construct the wetlands." Plaintiff's Motion at 51. It would be a truly extraordinary step for this Court to hold, on the basis of a single affidavit submitted by a permit applicant, that the EPA is barred from even investigating a question of such environmental import. It may well be that artificial swamps are as environmentally beneficial as those that have evolved over the course of centuries. This Court is not prepared, however, to decide such a question as a matter of law. To the extent the judiciary is qualified to pass judgment on such an issue, it is only at the conclusion of full administrative proceedings undertaken by the agency to which Congress has entrusted the protection of the nation's environment.

In sum, then, the Court finds that the RA did not abuse his discretionary authority by initiating section 404(c) proceedings in this case. The statute, and the regulations promulgated under it, give the RA wide latitude in determining when to commence such proceedings, requiring, in essence, a good faith belief that issuance of a permit might result in unacceptable harm to the environment. Pyramid has failed to demonstrate, as it must, that the RA in this case could not possibly have such a good faith belief.

---

**3.** Pyramid suggests that the panel will be "chaired by former EPA Administrator William Ruckelshaus, or someone of his same stature and experience." Plaintiff's Motion at 51.

## C. *Final Agency Action*

■ Pyramid maintains that the RA's initiation of the section 404(c) proceedings is final, and therefore reviewable, agency action precisely because it is illegal. The question of whether the RA's decision is final agency action, Pyramid argues, "is inextricable from the underlying claim that the agency lacked authority under the statute and regulations to initiate the proceeding." Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss ("Plaintiff's Opposition") at 5. Having concluded that the RA's commencement of section 404(c) proceedings was legal and proper, it follows that the action is neither final nor reviewable. Indeed, the EPA has simply *initiated* an investigation; it has made no final determinations, but, rather, has begun the process that will lead to such decisions. Judicial review at this stage of the proceedings is therefore improper.

The Supreme Court has adopted a pragmatic approach to determining whether agency action is "final" and therefore subject to judicial review. *Federal Trade Commission v. Standard Oil Co. of California*, 449 U.S. 232, 239, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980) *("SoCal"); Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The Court looks to see whether the action is "definitive"; whether it has a direct and immediate effect on the parties; and finally, whether judicial review will serve efficiency or enforcement of the regulatory scheme. *SoCal*, 449 U.S. at 240–43, 101 S.Ct. at 493–95. An examination of these factors in the present case makes obvious that the EPA's initiation of section 404(c) proceedings simply is not final agency action.

In *SoCal*, as here, the agency began an investigation by issuing a complaint stating that it had "reason to believe" that the relevant statute was being violated. *Id.* at 241, 101 S.Ct. at 493. The Supreme Court noted that such action does not constitute a definitive statement of the agency's position, but merely "represents a threshold determination that further inquiry is war-

ranted" and that proceedings should be initiated. *Id.* So too here, the RA's initiation of section 404(c) proceedings "merely represents a judgment that the matter is worth looking into." 44 Fed.Reg. 58,078 (1979). Pyramid argues that commencement of section 404(c) hearings has a direct and significant effect on it, since construction of the shopping center will be delayed as a result. But here, as in *SoCal*, the RA's action means "only that adjudicatory proceedings will commence." *Id.* at 241–42, 101 S.Ct. at 494. Pyramid's rights have not been fixed and its permit has not been denied. If the delays occasioned by administrative hearings were a sufficiently direct and immediate effect to warrant judicial review, then virtually all administrative investigations would constitute final agency action. Such delays standing alone clearly do not convert investigatory proceedings into final agency actions.

Finally, judicial review at this juncture would thwart rather than serve the interests of efficiency and enforcement of the statute. This Court is simply not the forum in which to decide, in the first instance, questions concerning practicable alternatives and the value of artificial wetlands. Congress has entrusted the resolution of such issues to the expertise of the EPA, and has directed that agency to base its decisions on a full record developed through public hearings. It would be contrary to the congressional scheme to preempt agency consideration and attempt to decide such questions as purely legal matters. *See Public Citizen Health Research Group v. Commissioner, Food and Drug Admin.*, 740 F.2d 21, 30 (D.C.Cir. 1984) ("judicial resolution of substantive issues that are the subject of an ongoing agency proceeding" impermissible); *Association of National Advertisers, Inc. v. Federal Trade Comm'n*, 627 F.2d 1151, 1180 (D.C.Cir.1979) (Leventhal, J., concurring) (finality doctrine permits judicial intervention in ongoing agency proceeding only in cases of clear violation of statutory standards), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980).

Accordingly, for the reasons set forth above, the Court concludes that it lacks jurisdiction over this matter and therefore dismisses the action.

SO ORDERED.