John A. **BERSANI**, Newport Galleria Group, Robert J. Congel and the Pyramid Companies, Plaintiffs,

and

Citizens in Support of Attleboro Mall and Joseph Robichaud, Intervenor–Plaintiffs,

and

Home Builders Association of Massachusetts, Intervenor–Plaintiff,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; United States Army Corps of Engineers; Lee Thomas, in his official capacity as Administrator of the United States Environmental Protection Agency; Richard K. Dawson, in his official capacity as Assistant Secretary for Civil Works, United States Army; and Jennifer Joy Wilson, in her official capacity as Assistant Administrator for External Affairs, United States Environmental Protection Agency, Defendants,

and

Conservation Law Foundation of New England, Environmental Defense Fund, National Audubon Society, Sierra Club Legal Defense Fund, and National Wildlife Federation, Intervenor–Defendants.

No. 86–CV–772.

United States District Court, N.D. New York.

Oct. 6, 1987.

Beveridge & Diamond, P.C., Washington, D.C., Levine, Gouldin & Thompson, Binghamton, N.Y., for plaintiffs; Gary H. Baise, Virginia S. Albrecht, Marc Zeppetello, Washington, D.C., David M. Gouldin, Binghamton, N.Y., of counsel.

Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Boston, Mass., for intervenor-plaintiff Home Builders Ass'n of Massachusetts; Michael S. Gardener, of counsel.

Paul D. Kamenar, Washington, D.C., for intervenor-plaintiffs Citizens in Support of Attleboro Mall and Joseph Robichaud.

Lawrence R. Liebesman, U.S. Dept. of Justice, Land and Natural Resources Div., Washington, D.C., for defendants.

Gail B. Cooper, Office of General Counsel, E.P.A., Washington, D.C., for defendants.

Ann Williams–Dawe, Boston, Mass., for defendants U.S. E.P.A.

James T.B. Tripp, New York City, for defendant-intervenor Environmental Defense Fund.

Robert Dreher, Washington, D.C., for defendant-intervenor Sierra Club Legal Defense Fund.

McDermott, Will & Emery, Washington, D.C., for amicus curiae United States Chamber of Commerce; R. Sarah Compton, of counsel.

Chernin & Gold, Binghamton, N.Y., for amicus curiae U.S. Chamber of Commerce; Donald M. Flanagan, of counsel.

## DECISION AND ORDER

McAVOY, District Judge.

Plaintiffs John A. Bersani, the Pyramid Companies[1], Robert J. Congel and the Newport Galleria Group[2] have brought this action challenging a "Final Determination" rendered by the defendant United States Environmental Protection Agency (the "EPA") on May 13, 1986, pursuant to Section 404(c) of the Clean Water Act, 33 U.S.C. section 1344(c).[3] This Final Determination vetoed a decision rendered by the defendant United States Army Corps of Engineers (the "Corps") in June 1985, which decision granted Pyramid permission to construct a shopping mall in certain wetlands, known as "Sweden's Swamp," located in South Attleboro, Massachusetts. Pyramid seeks an order from this Court vacating the EPA's determination on the grounds that it is arbitrary, capricious and otherwise not in accordance with the law. *See* 5 U.S.C. sections 704, 706. The court has before it plaintiffs' and defendants' cross-motions for summary judgment.[4]

1. Pyramid is an association of partnerships which is in the business of developing, constructing and operating shopping centers in the Northeastern United States.

2. The plaintiffs will be collectively referred to as "Pyramid."

3. The EPA Administrator delegated the authority to make a final decision regarding permits issued under Section 404(a) of the Act to the Assistant Administrator of External Affairs at the time of the proceeding at issue. This final determination constitutes final agency action under Section 404(c) of the Act for the purposes of judicial review. 40 C.F.R. sections 231.5 and 231.6.

4. Both Intervenor–Plaintiffs and Intervenor–Defendants have submitted motions for summary judgment. The arguments of the former are incorporated into the discussion concerning the plaintiffs' motion and the arguments of the latter are incorporated into the discussion regarding the defendants' motion.

Oral argument on these motions was heard by this court on April 2, 1987. Thereafter, Intervenor–Defendants' raised the question of whether this lawsuit was moot. After three months of discovery, the parties withdrew their assertion of mootness.

## BACKGROUND

### 1. Statutory and Regulatory Framework

The Clean Water Act (the "Act"), 33 U.S.C. sections 1251 *et seq.*, the basic federal legislation controlling water pollution, embodies Congress' effort to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. 33 U.S.C. section 1251. Section 301(a) of the Act, 33 U.S.C. section 1311(a), forbids the discharge of any pollutant into "navigable waters"[5] unless permitted by the Army Corps of Engineers pursuant to Section 404. *See* 33 U.S.C. section 1344.

Section 404(a) authorizes the Secretary of the Army, acting through the Corps, to issue permits for the discharge of dredged or fill material at specified disposal sites. 33 U.S.C. section 1344(a). Criteria known as the Section 404(b) guidelines developed by the EPA, in conjunction with the Corps, govern these permitting decisions. 33 U.S.C. section 1344(b).[6] Generally, the Corps must employ a **"practicable alternative"** analysis in determining whether to allow a proposed discharge. 40 C.F.R. section 230.-10 provides, in part:

(a) Except as provided under section 404(b)(2) [pertaining to navigation] **no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem,** so long as the alternative does not have other significant adverse environmental consequences.

(2) **An alternative is practicable if it is available and capable of being done, after taking into account cost, existing technology, and logistics in light of overall project purposes.** If it is other-

wise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

(3) Where the activity associated with a discharge which is proposed for a special aquatic site [defined in Subpart E to include wetlands] does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), **practicable alternatives that do not involve special aquatic sites are presumed to be available unless clearly demonstrated otherwise.** In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

40 C.F.R. sections 230.10(a)(2) and (3) (emphasis added).[7]

When the proposed discharge involves a special aquatic site such as wetlands, a more stringent standard is imposed. Indeed, Section 230.10(a)(3) creates a presumption that a practicable alternative exists when the discharge involves wetlands and the activity, here a shopping mall, is not "water dependent." Then the applicant must "clearly demonstrate" that no such alternative does in fact exist.

Section 404(c) grants the Administrator of the EPA authority to prohibit, deny or restrict a Corps-issued permit for the use of a specific site when the Administrator determines that the proposed discharge "will have an **unacceptable adverse effect on** municipal water supplies, shellfish beds

---

5. Section 502 of the Act defines navigable waters as "waters of the United States." 33 U.S.C. section 1362(7). There is no dispute that the wetlands comprising Sweden's Swamp are navigable waters. *See* 33 C.F.R. section 323.2. Nor is there any dispute that the plaintiffs' proposal involves the discharge of dredged and fill materials, which are pollutants within the meaning of the Act, into those waters. *See* 33 U.S.C. section 1362(6) (pollutant includes dredged spoil).

6. The section 404(b)(1) guidelines are published at 40 C.F.R. Part 230.

7. The other Section 404(b)(1) criteria which must be satisfied before a permit may issue are (1) compliance with other applicable laws, (2) the absence of significant degradation of the Nation's waters, and (3) the adequate mitigation of potential adverse impacts. *See* 40 C.F.R. sections 230.10(b)-(b).

and fishery areas (including spawning and breeding areas), **wildlife,** or recreational areas." 33 U.S.C. section 1344(c) (emphasis added). An "unacceptable adverse effect" is one which has an "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or **significant loss of or damage to** fisheries, shellfishing, or **wildlife habitat** or recreation areas." 40 C.F. R. section 231.2(e) (emphasis added). This "veto" power must be exercised in accordance with established procedure. *See* 40 C.F.R. Part 231.

## 2. Procedural History

Pyramid initially became interested in developing a shopping mall in the Attleboro area in September 1983, and focused its attention on an 82–acre site in South Attleboro about one-fourth mile north of the Rhode Island border. Although the project contemplated altering or filling 32.2 acres of 49.6 acres of wetlands, the plan also called for excavating 9.0 acres of uplands (non-wetlands) to create new wetlands and altering an existing 13.3 acres of wetlands to enhance its value for wildlife, fisheries and other quality maintenance.[8] Another 4.0 acres of existing wetlands would remain undisturbed.[9] Upon completion of construction, 26 acres of wetlands including marsh areas, red maple swamp and open water would remain. Additionally, Pyramid proposed an off-site mitigation project which would result in the creation of 36 acres of replacement wetlands in an abandoned gravel pit.[10]

### State Proceedings

In April 1982, the Massachusetts Department of Environmental Quality Engineering (MDEQE) denied state permission to construct a mall at the Sweden's Swamp site to Pyramid's predecessor, the Edward J. DeBartolo Corporation. The DeBartolo Corporation requested an adjudicatory hearing, prior to which Pyramid assumed control of the project. In March 1985, the MDEQE issued a Superseding Order of Conditions which overturned the initial denial and authorized the project.[11] This decision was appealed on the ground that the MDEQE had improperly reviewed Pyramid's project under the state's 1978 wetlands protection regulations rather than under the more stringent regulations which had taken effect in April 1983. On September 30, 1986, a state court ruled that the MDEQE's decision to grandfather the project was error and remanded the matter to the MDEQE to determine the rights of the parties under the 1983 regulations. As a consequence of this ruling, the new regulations, which prohibit the filling of more than 5,000 square feet of bordering vegetated wetlands, applied to Pyramid's proposal, *see Laurie Carroll v. DEQE,* No. 76012, (Mass.Super.Ct. September 30, 1986), and barred its implementation. This decision was reversed on appeal. *See Citizens for Responsible Environmental Management v. Attleboro Mall, Inc.,* 400 Mass. 658, 511 N.E.2d 562 (1987).

### Federal Proceedings

In May 1984, the Corps, the Fish and Wildlife Service and the EPA held a meeting with Pyramid wherein Pyramid's proposal was discussed and compared to that of its predecessor, the DeBartolo Corpora-

---

**8.** The May 13, 1986 Final Determination of the Assistant Administrator for External Affairs (FD) is document H–119 in the certified index to the Administrative Record. The March 5, 1986, Recommendation of the EPA Regional Administrator (RD) is document B–25 in the certified index. The Statement of Findings and Environmental Assessment of the Corps (SOF/EA) is document B–16 in the certified index. All other documents will be referred to by the number assigned them in the certified index.

The alteration of these additional 13.3 acres is necessary to provide onsite capability for storage and treatment of stormwater runoff from the development. FD, Plaintiff's Exhibit B, at 5; B–2, "Section 404 Application," at 31–64.

**9.** SEOF/EA at 1.

**10.** FD at 5; C–54, "Final Report on Mitigation Site," at 1–6.

**11.** The state regulations differ from the federal regulations in that they do not include the protection of wildlife habitat or the existence of practicable alternatives as considerations. *See* RD at 5.

tion. Pyramid requested that the project be authorized under a Corps "nationwide permit," a general permit requiring no application or public review. At that time, the EPA informed Pyramid of the rebuttable presumption that practicable, less environmentally damaging alternatives exist for non-water dependent projects located in wetlands. RD at 3. *See* 40 C.F.R. section 230.10(a). Thereafter, the Corps exercised its discretionary authority and required Pyramid to apply for an individual Section 404(a) permit.

In connection with its August 1984, Section 404(a) application, Pyramid submitted information concerning practicable alternative sites for its shopping mall.[12] A site three miles north in North Attleboro, Massachusetts was chiefly considered by the Corps and the EPA.[13] Pyramid relied on several factors in concluding that the North Attleboro site was not a practicable alternative; namely, the site lacked sufficient traffic volume and sufficient access from local roads, potential department store tenants had expressed strong doubts about the feasibility of the site and previous attempts to develop the site had met with strong resistance from the surrounding community.[14] In November 1984, after Pyramid had first presented its offsite mitigation proposal to convert a gravel pit into wetlands, the EPA recommended that the Corps deny the permit because of Pyramid's perceived failure to overcome the presumption that a less environmentally damaging practicable alternative existed. In January 1985 the Corps retained a consultant to examine the practicability of a mall at the North Attleboro site and the Corps and the EPA conducted an on-site investigation of the North Attleboro property. RD at 5. As a result, the Corps advised Pyramid that refusal of its permit was imminent. *Id.* In April 1985, Pyramid

presented its plan for the creation of 36 acres of new wetlands in an effort to mitigate the loss which would occur at Sweden's Swamp.[15]

On May 2, 1985, the Division Engineer of the New England Division of the Army Corps sent his recommendation on Pyramid's application to the Director of Civil Works, Major General Wall, at Corps Headquarters in Washington, D.C. This recommendation urged that the permit be denied because a practicable alternative with a less adverse effect on the aquatic ecosystem existed.[16] In his review of the application, Major General Wall concluded:

> In a proper case, **mitigation measures can be said to reduce adverse impacts** of a proposed activity to the point where there is no "easily identifiable difference in impact" between the proposed activity (including mitigation) versus the alternatives to that activity. In such a case, mitigation measures would have made a contribution to the satisfaction of 40 C.F.R. 230.10(a) [the practicable alternatives test].

B–13 at 5 (emphasis added); SOF/EA, Views of the Chief of Engineers at 5. Under this interpretation, proposed mitigation at one site would suffice to establish that no less damaging practicable alternative existed. However, Major General Wall also employed a traditional analysis of the practicable alternatives and found:

> [F]rom the point of view of the applicant in this case, it appears that the North Attleboro site is not available. The north site is controlled by a competitor who has an interest in developing a regional shopping mall in the same trade area as the applicant. Even if it were available to the applicant, he makes a convincing argument that it would not successfully fulfill the purposes of his proposed project, from his particular point of view.

---

12. At this time, Pyramid had not yet proposed any off-site mitigation. B–2; B–4.

13. RD at 4; B–2; B–173, "Feasibility Analysis" prepared for State Properties of New England (New England Development Co); B–226, "Letter dated December 10, 1984 from State Properties of New England to Corps, EPA and FWS."

14. B–2 at 13–15; RD at 34–37.

15. RD at 5. Pyramid eventually dropped the site from consideration.

16. RD at 6; B–11, "Corps Recommendation dated May 2, 1985"; B–12, "Corps Recommendation."

B-13 at 1; SEOF/EA, Views of Chief of Engineers at 1.

Although Sweden's Swamp is characterized in this report as a wetland of relatively low value and degraded by uncontrolled use and by dumping of solid waste, its function as a wildlife habitat is recognized. *Id.* at 2. Major General Wall directed the New England Division of the Corps to prepare a notice of intent to issue the permit and to reconcile its findings with the foregoing determination. *Id.*

Accordingly, the Corps concluded that no practicable alternative to the South Attleboro site existed because the North Attleboro site was not available to Pyramid and substantial doubt existed as to whether the site would fulfill Pyramid's purpose. Although the Corps determined that the proposed project would not have an adverse effect on water quality, flood control or drinking water supplies, it expressed concern that the proposed reduction in on-site wetland acreage "could cause substantial adverse impact on local stocks of those species associated with forested wetland cover type ... (i.e., red-shouldered hawk, small birds, small mammals such as skunk, possum and raccoon, and certain reptiles and amphibians.") SOF/EA at 16. The Corps, therefore, conditioned the issuance of any permit specifying Sweden's swamp as a disposal site upon the Corps' approval of Pyramid's mitigation efforts. *Id.* at 36.

On June 28, 1985, the Division Engineer notified the regional offices of the EPA and the United States Fish and Wildlife Service (FWS) of the Corps' intent to issue a permit to Pyramid.

### EPA's Decision

On July 23, 1985, the EPA's Regional Administrator notified the Corps and Pyramid that he intended to initiate Section 404(c) proceedings.[17] The EPA based this decision upon its belief that an unacceptable adverse effect to wildlife could result from filling Sweden's Swamp. On March 4, 1986, the Regional Administrator made a "Recommended Determination" to prohibit the specification of Sweden's Swamp as a disposal site for dredged or fill material. The Recommendation was based

upon the finding that Pyramid's project was likely to have unacceptable adverse impacts on the wildlife habitat at Sweden's Swamp. On May 13, 1986, the EPA issued its Final Determination prohibiting the specification of Sweden's Swamp as a disposal site for fill material.

The Final Determination described Sweden's Swamp as a typical, well-established functioning red maple swamp which provides excellent wildlife habitat for a variety of birds, mammals, and amphibians, and provides flood storage capacity, groundwater discharge and water purification. FD at 30. It further found that the destruction of the wetlands proposed by Pyramid would adversely affect wildlife by driving away or killing animals currently living there. *See* FD at 10–12. The EPA declared:

> In determining whether these adverse impacts are unacceptable [within the meaning of section 404(c)], it is relevant to examine next the avoidability of this wetland loss by reviewing whether there are practicable, less environmentally damaging alternatives to the proposed project.

FD at 13.

In the EPA's opinion, another less environmentally damaging site in the area, i.e., the North Attleboro site, was a feasible alternative which had been available at the time Pyramid initially selected a site for its project. FD at 16–26, 31. Thus, the EPA reasoned that any adverse effects resulting from Pyramid's project were avoidable and were therefore unacceptable within the meaning of Section 404(c). The Final Determination concluded that "based on the excellent wildlife value of the wetland ... its site and setting, the avoidability of the loss, and the significance of such areas in Massachusetts, ... filling Sweden's Swamp to build the proposed mall would have unacceptable adverse effects within the meaning of section 404(c)." FD at 31.

### DISCUSSION

#### 1. Summary of Arguments

The plaintiffs contend that the EPA's decision to deny the permit is incorrect as a

17. RD at 7; B–316.

matter of law because (1) the EPA impermissibly relied on the "avoidability" of environmental impacts in determining their "unacceptability" under Section 404(c) and (2) the EPA impermissibly reconsidered the Section 404(b) availability question and backdated that inquiry.[18] Plaintiffs also argue that even if the EPA's statutory and regulatory interpretations are upheld as reasonable, the EPA's conclusion was arbitrary and capricious. The defendants, on the other hand, argue that Section 404(c) clearly allows the EPA to prohibit the filling of a wetland where that filling would have an unacceptable adverse impact on wildlife. The EPA contends that it was authorized to consider the Section 404(b)(1) guidelines in determining whether the environmental impacts were unacceptable and that its decision to assess the practicable alternatives available at the time of project planning was proper and consistent with the Act's and the regulations' goals.

## 2. Standard of Review

As noted, the court has before it now the parties' cross-motions for summary judgment. Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The facts in this case are undisputed. In reviewing the EPA's decision, the court must engage in a two-fold inquiry and determine (1) whether the EPA's interpretation of Section 404 and its implementing regulations was reasonable and (2) whether the EPA's application of this interpretation to the facts was rational.

■ An agency's interpretation of the statute and regulations it is charged with administering is entitled to deference. *See EPA v. National Crushed Stone Ass'n.,* 449 U.S. 64, 83, 101 S.Ct. 295, 307, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980). This is also true when the agency participated in formulating a disputed regulation. *See United States v. Hescorp. Heavy Equip. Sales Corp.,* 801 F.2d 70, 76 (2d Cir.1986) (treasury regulation construed) (citing *Mil-*

*ler v. Youakim,* 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979)). Its interpretation need not be the only reasonable one, and the court must uphold a reasonable interpretation, even if the court would not have reached the same conclusion in the first instance. A court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency when a "statute is silent or ambiguous with respect to the specific issue. [Then] the question for the court is whether the agency's answer is based upon a permissible construction of the statute." The court, must, however, reject administrative constructions which are contrary to clear congressional intent. *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. at 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985); *Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 126, 105 S.Ct. 1102, 1108, 84 L.Ed. 2d 90 (1985); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Biggs v. Lyng,* 823 F.2d 15, 18 (2d Cir.1987).

Because the Clean Water Act does not set forth the standards for review of the EPA's substantive decisions, the court must look to the standards articulated in the Administrative Procedure Act for guidance. *See Avovelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897 (5th Cir.1983). The proper inquiry for the court is whether the EPA's Final Determination is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." *See* Administrative Procedure Act section 10(e), 5 U.S.C. section 706(2)(A); *Buttrey v. United States,* 690 F.2d 1170, 1183–85 (5th Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983). In undertaking this task, the court must remain mindful of the carefully circumscribed nature of its function. In *Motor Vehicle Mfrs. Ass'n v. State Farm Auto Ins. Co.,* 463 U.S. 29, 42–43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983), the

---

**18.** The plaintiffs also allege that the EPA impermissibly amended a regulation without the procedures mandated by the Administrative Procedure Act. The court rejects this contention.

Supreme Court delineated the boundaries of the court's review in applying the arbitrary and capricious standard.

[A] reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute ... The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 [83 S.Ct. 239, 246, 9 L.Ed.2d 207] (1962). In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 285; [95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)]; *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416 [91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)]. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to agency expertise.

*Accord Sierra Club v. United States Army Corps of Engineers,* 772 F.2d 1043, 1051 (2d Cir.1985); *Avovelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 904 (5th Cir.1983); *Great Salt Lake Minerals and Chems. v. Marsh,* 596 F.Supp. 548, 553 (D.Utah 1984). In reviewing the EPA's determination of the facts in the case at bar, the court is limited to a review of the administrative record. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed. 2d 106 (1973); *accord Buttrey v. United States,* 690 F.2d 1170, 1184 (5th Cir.1982) (reviewing decision of Corps under Section 404(b) Guidelines). Keeping these principles in mind, the court now turns to an examination of the issues at hand.

### 3. Use of Section 404(b)(1) Guidelines in Section 404(c) Review

Pyramid contends that the avoidability of potential adverse environmental impacts of a proposed disposal of fill material may not be considered in evaluating the **unacceptability** of those impacts and challenges the EPA's use of this criterion. Pyramid would have this court adopt a narrow construction of Sections 404(b) and (c) and the regulations promulgated thereunder. Pyramid contends that the EPA may *not* consider nonenvironmental findings already made by the Corps at the permitting stage in determining whether a proposal will have unacceptable adverse environmental results within the meaning of Section 404(c) and 40 C.F.R. section 231.2(e). The EPA, on the other hand, argues that the use of the "practicable alternatives" test set forth in the Section 404(b)(1) guidelines governing the Corps' decision are equally applicable to an EPA decision under Section 404(c). Moreover, the EPA asserts that independent consideration of the "practicable alternatives" test was proper.

### Statutory Language

Section 404(c) allows the EPA to forbid specification of a particular disposal site when it determines that a proposed discharge "will have an unacceptable adverse effect." 33 U.S.C. section 1344(c). The statute itself restricts the EPA in only two ways. First, the EPA must provide for notice and a public hearing, which it undeniably did in the case at bar, and second, the EPA must evaluate unacceptable adverse effects in terms of municipal water supplies, shellfish beds and fishery areas, wildlife or recreation areas. 33 U.S.C. section 1344(c). The 404(c) regulations reiterate this latter limitation and define an "unacceptable adverse effect" as an "impact on an aquatic or wetland ecosystem which is likely to result in significant loss of or damage to" any of the environmental interests enumerated in Section 404(c), including wildlife areas.

Pyramid contends that neither the statute itself nor the implementing regulations authorize the EPA to take into account the existence of a "practicable alternative" when making a determination that a proposed project will have an unacceptable adverse impact and result in significant degradation to one of the enumerated environmental interests. Section 404(c) does not define the term "unacceptable adverse effects" or specify the factors relevant to an "unacceptability" determination. On the other hand, nothing in the statute prohibits the use of the 404(b)(1) guidelines in making that determination. In addition, the Section 404(c) regulations note that the EPA should consider the "relevant portion of the [404(b)] guidelines" in making a Section 404(c) unacceptability determination. 40 C.F.R. section 231.2(e).

These guidelines are based in part on the Section 403(c) criteria regulating ocean discharges. Section 403(c) identifies a broad range of factors to be considered by the Administrator in promulgating guidelines under Section 403(c).[19] Section 403(c)(1)(F) includes the availability of other "possible locations and methods of disposal" as a factor. The 404(b)(1) guidelines likewise mandate consideration of the availability of other possible locations in order to minimize unnecessary destruction of aquatic resources. Under Pyramid's analysis, however, the only relevant portions of the 404(b)(1) guidelines are those which directly pertain to the five resources listed in Section 404(c).

The court rejects Pyramid's contention that the fact that Section 403(c) and Section 404(b) are concerned with a greater number of environmental factors than is Section 404(c) limits the **manner** in which the EPA may determine the effect on the 404(c) resources, including the use of the practicable alternatives test. Both the 404(b)(1) guidelines and the section 403 criteria, upon which they are patterned, provide a means to evaluate the desirability of discharges into the aquatic environment. Applying these standards to a proposed discharge in a particular context does no violence to the policy underlying the Act. These guidelines provide a useful tool for evaluating discharges into the aquatic environment. Furthermore, the fact that Section 403(c) explicitly allows an agency to consider a certain factor does not necessarily mean that the absence of such a provision in Section 404(c) precludes consideration of that factor. Instead, use of these criteria makes the general standard workable. Moreover, the EPA did not use the Section 404(b)(1) guidelines to find an unacceptable adverse impact on any resource not specified in Section 404(c). The unacceptability of the site was determined with respect to wildlife, a category explicitly enumerated thereunder.[20]

■ Alternatively, Pyramid argues that the EPA's interpretation is in contravention to the clear language of the regulations. An unacceptable adverse effect is defined as an "impact on the aquatic or wetland ecosystem which is likely to result in significant loss of or damage to" any of the environmental resources enumerated in Section 404(c). 40 C.F.R. section 231.2(e). Arguably, the only relevant portion of the 404(b)(1) guidelines are those pertaining to the degree or magnitude of an effect[21],

---

19. Section 403(c) states, in part:
    (c)(1) The Administrator shall ... promulgate guidelines for determining the degradation of the waters of the territorial seas, the contiguous zone, and the oceans, which shall include:
    (A) The effect of disposal of pollutants on human life ...;
    (B) the effect of disposal of pollutants on marine life....;
    (C) the effect of disposal of pollutants on aesthetic, recreation and economic values;
    (D) the persistence and permanence of the effects of the disposal of pollutants;
    (E) the effect of the disposal at varying rates, of particular volumes and concentrations of pollutants;

    (F) other possible locations and methods of disposal or recycling of pollutants including land-based alternatives; and
    (G) the effect on alternate uses of oceans, such as mineral exploitation and scientific study.
    33 U.S.C. section 1343(c)(1)(A)–(G).

20. This aspect of the Final Determination will be discussed at a later point in this opinion.

21. The term "significant" as used in the 404(b)(1) guidelines means "important, major or consequential." *Sierra Club v. United States Army Corps of Engineers*, 772 F.2d 1043, 1053 (2d Cir.1985).

and only those findings relevant to determining whether a significant degradation has occurred under Section 404(b) are relevant to the EPA's inquiry under Section 404(c).[22] The 404(b) regulations state that findings of significant degradation shall be based upon appropriate factual determinations, evaluations and tests required by subparts B and G, after consideration of subparts C–F of 40 C.F.R. section 230. Although Subpart B prohibits discharges when a practicable alternative exists, Pyramid focuses exclusively on that portion of Subpart B which prohibits significant degradation to waters and claims that it alone is relevant to a Section 404(c) analysis.

The court finds, however, that the pertinent regulations, when read as a whole, do not mandate this restrictive interpretation. Indeed, the regulations expressly state that "degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources." 40 C.F.R. section 230.1(d). The 404(b)(1) guidelines address not only the magnitude of the loss but also the avoidability of the loss.

▮ The court finds the EPA's interpretation that the avoidability of a loss may be considered in conjunction with its magnitude in determining whether it is "unacceptable" within the meaning of Section 404(c) and "significant" within the meaning

of the implementing regulation is reasonable. This interpretation does not violate the plain language of the statute or the language of the pertinent regulations.

Pyramid also objects to the EPA's "de novo" review of the Corps determination that no practicable alternatives were available. Neither the statute nor the pertinent regulations mandate that the EPA accept all or part of the Corps' findings under Section 404(b) in making its determination under Section 404(c). The plaintiffs contend that this freedom will allow the EPA unbridled authority to second guess every application by the Corps of the 404(b)(1) guidelines [23] and will effectively vitiate the scheme of review envisioned by Congress.

Although the statute itself does not prohibit the Administrator from exercising his independent judgment in applying portions of the 404(b)(1) guidelines in deciding whether an adverse effects are unacceptable under Section 404(c),[24] the court must examine the legislative history. An administrative interpretation which appears reasonable under the language of the statute but is contrary to the intent of Congress cannot be upheld. *See Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 101 S.Ct. 2239, 68 L.Ed.2d 744 (1981) (statutory language controls unless clear legislative intent to contrary).

---

**22.** 40 C.F.R. section 230.10(c) provides, in part: [N]o discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States. Findings of significant degradation related to the proposed discharge shall be based upon the appropriate factual determinations, evaluations, and tests required by Subparts B and G, after consideration of Subparts C through F, with special emphasis on the persistance and permanence of the effects outlined in those subparts. Under these Guidelines, effects contributing to significant degradation considered individually or collectively include:
(3) Significant adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat ...

**23.** Pyramid claims that adoption of the defendants' view will result in gross duplication of administrative effort. The court however, questions the accuracy of this prophecy. The EPA has completed only five Section 404(c) proceed-

ings as compared to the thousands of permit decisions made by the Corps since the enactment of the Federal Water Pollution Control Act in 1972.

**24.** Indeed, Judge Green, in *Newport Galleria Group v. Deland,* 618 F.Supp. 1179, 1182 n. 2 and 1184 (D.D.C.1985), noted *albeit* in dicta, that "it would be extraordinary if Congress granted the EPA veto power over the Corps' permit decision, but precluded it from reconsidering those issues the Corps considered in granting the permit in the first place ... if the section 404(c) veto is to have any meaning at all, the EPA must be able to disagree with the Corps' conclusions." In *Newport Galleria Group,* the plaintiffs herein sought to enjoin the EPA Regional Administrator from commencing Section 404(c) proceedings. They asserted therein that the EPA had no authority to reconsider the practicable alternatives already considered by the Corps. The court dismissed the action on the basis that final reviewable agency action had not occurred.

### Legislative History

■ Pyramid claims that the legislative history demonstrates Congress' intent to vest the Corps with broad authority to consider "reasonable alternatives" as part of the permitting process and to restrict the EPA's reviewing authority to areas of environmental concern. Plaintiffs rely on language contained in the House bill and report in making this assertion.

The House bill gave the Corps responsibility for regulating the discharge of dredged or fill materials but recognized the EPA's expertise in environmental areas. *See* H.R. 11896, 92d Cong., 2d Sess. (1971), *reprinted in 1 Legislative History of the Water Pollution Control Act Amendments of 1972* at 1063 (1973). Thus the EPA was given authority, but this authority was restricted to prohibiting the discharge of dredged or fill materials "in critical areas" such as "shellfish beds, breeding or spawning areas, highly susceptible resort beaches, and similar areas." H.R. Rep. No. 911, 92d Cong., 2d Sess. 129 (1972), *reprinted in 1 Leg. History* at 816. Moreover, the Corps was not required to follow the EPA's designation of critical areas when the Corps certified that there was no "feasible alternative reasonably available." H.R. 11896, *reprinted in 1 Leg. History* at 816.

The original Senate bill, however, made no distinction between disposal of dredged or fill material and any other pollutant. S. 2770, 92d Cong., 1st Sess. (1971), *reprinted in 2 Leg. History* at 1685–92 (1972). Consequently, the Senate, recognizing and deferring to the agency's expertise in environmental areas, proposed that permitting authority lie with the EPA. Senate Debate on S. 2770, 92d Cong., 1st Sess. (1971), *reprinted in Leg. History* at 1387–88. Amendments giving the Corps exclusive authority to regulate the discharge of dredged or fill material were rejected. S.Rep. No. 414, 92d Cong., 1st Sess. 92 (1971), U.S.Code Cong. & Admin.News 1972, p. 3668, *reprinted in 2 Leg. History* at 11059.

The version finally adopted represented a compromise between both houses whereby the Corps retained its traditional permitting authority and the EPA exercised its expertise in evaluating impacts on environmental resources. *See* S.Rep. No. 92–1236, 92d Cong., 2d Sess., *reprinted in 1 Legislative History* at 324–35. Senator Muskie described this compromise as follows:

A major difference between the Senate Bill and the House amendment related to the issue of dredging. The Senate Committee had reported a bill which treated the disposal of dredged spoil like any other pollutant. Pursuant to an amendment accepted on the Senate floor, dredged spoil disposal was made subject to a different set of criteria to determine any environmental effects.

The House bill not only established a different set of criteria to determine the environmental effects of dredged spoil disposal but also designated the Secretary of the Army rather than the Administrator of the Environmental Protection Agency as the permit issuing authority. The Conference agreement follows those aspects of the House bill which related to the Secretary of the Army's regulatory authority. However, consistent with the Senate provision, the Administrator of the [EPA] has three clear responsibilities and duties.

First, the Administrator has both responsibility and authority for failure to obtain a Section 404 permit or comply with the condition thereon. Section 309 authority is available because discharge of the "pollutant" dredge spoil without a permit or in violation of a permit would violate section 301(a).

Second, the [EPA] must determine whether or a not a site to be used for the disposal of dredge spoil is acceptable when judged against the criteria established for fresh and ocean waters similar to that which is required under Section 403.

Third, prior to the issuance of any permit to dispose of spoil, the Administrator must determine that the material to be disposed of will not adversely affect the municipal water supplies, shellfish beds and fishery areas (including spawning

and breeding areas), wildlife or recreational areas in the specified site. Should the Administrator so determine, no permit may issue.

1 *Leg. History* at 177 (emphasis added). Pyramid characterizes the compromise reached as reflecting Congress' desire to give each agency a discrete role.

However, nothing in the legislative history indicates Congress' desire to limit the EPA's role in assessing the environmental acceptability of a site. Indeed, statutory language should be interpreted in a way that harmonizes it with the general purposes manifested by Congress. *See C.I.R. v. Engle*, 464 U.S. 206, 104 S.Ct. 597, 78 L.Ed.2d 420 (1984). None of history cited demonstrates that the Administrator may not consider the practicable alternatives test originally employed by the Corps in determining the environmental impact of a proposed discharge on the five identified resources.

### 4. Practicable Alternative Finding
#### Feasibility

█ In order to be a practicable alternative, the alternative must be feasible. Pyramid argues that the EPA's determination of feasibility was based upon its erroneous conclusion that the marketplace considered the North Attleboro site suitable for a virtually identical regional shopping mall. FD at 16. Pyramid notes that six other shopping center developers over the past fifteen years have tried and failed to develop the North Attleboro site as a shopping center. B-6 at 4-12. It contends that the EPA impermissibly substituted its own judg-

ment for that of the marketplace in an area in which it cannot claim expertise. *See Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir.1986).[25] Pyramid would, therefore, require the EPA to adhere to the details of an applicant's plan.

The EPA, however, contends that it did not simply substitute its judgment for that of the developer. Indeed, "an applicant's submission of information clearly within its expertise is normally accepted by the Agency." FD at 17. Instead, the EPA argues that the evidence on the record demonstrates that the North Attleboro site is suitable in fact for a regional shopping mall virtually identical to that proposed by Pyramid.[26] In this respect, the fact that a competing developer the New England Development Company, Inc. had found the site suitable for a similar shopping mall, *See* B-235; B-173, and its own marketing analysis weighed in reaching this decision. FD at 17; B-863. The EPA also engaged in a review of the specific features that Pyramid found objectionable; namely, the distance from the primary trade area[27], lack of visibility from near-by highways[28], zoning[29], past failures of prior attempts to develop a shopping mall at the site[30], and various practical considerations.[31] Consequently, the court finds that the EPA's feasibility determination was not arbitrary.

#### Availability

█ The EPA contends that its interpretation of "availability" was reasonable and its finding that at least one practicable alternative existed was not arbitrary and capricious. An alternative is practicable if it **"is available"** and **"capable of being done after taking into consideration cost,**

25. The court held that the Corps' reliance on a 404 applicant's submissions on feasibility was proper and stated that "the Corps is not a business consulting firm, it is in no position to conduct a feasibility study of alternative sites."

26. FD at 16. B-173, "Feasibility Analysis for State properties of New England"; B-235, "Mall Market Analysis for Corps."

27. FD at 17-18.

28. The EPA determined that the site was visible from I-295 and Route 1. FDA at 18.

29. The EPA determined that the zoning had been changed to accommodate a shopping mall. FD at 18.

30. The EPA determined that the North Attleboro site was competing for some the same tenants that Pyramid had considered. Furthermore, the New England Development Company had not encountered any major obstacles in its efforts to develop the North attleboro site. FD at 19; *see* H-81.

31. The EPA determined that these same practical considerations afflicted the Sweden's Swamp site. FD at 19.

existing technology and logistics in light of overall plan purposes." 40 C.F.R. 230.-10(a). For the purposes of this section, **"an area not presently owned by the applicant which could be reasonable obtained ... may be considered."** *Id.* The plaintiffs argue that "available" means "presently available." Under this interpretation, the permitting authority would be required to limit its consideration of the alternative sites to those sites which are available to the applicant *at the time the agency makes its decision on the permit application.* Thus, Pyramid claims that the EPA engaged in impermissible "backdating" when it decided that the availability determination should be made at the time the applicant "entered the market", FD at 21 n. 14, "began its investigation," *Id.* at 22 or "comprehensively evaluated the area." *Id.* at 22 n. 15. Pyramid argues that this interpretation gives the EPA unlimited power to block proposals merely because some alternative was available in the past.

The EPA counters this argument by noting that Pyramid's interpretation of the regulations undercuts the purpose underlying the practicable alternatives test and that it is reasonable and consistent to expect applicants planning non-water dependent projects to demonstrate that construction on uplands was considered before the use of wetlands was contemplated. Plaintiffs, however, argue that the regulations do not impose any pre-application obligation on the applicant to investigate the use of uplands, rather, they maintain that the burden is on the Corps to determine whether an alternative "is available."

Pyramid also bases its conclusion on the language of the regulation itself which states that "an alternative is practicable if it is available." The EPA contends that the term "is available" can refer to any time period in which the guidelines are applied. The Final Determination focused on the point in time when the applicant actually examined the alternatives. This interpretation guards against manipulation by developers.

Nevertheless, Pyramid argues that the EPA's interpretation of availability is entitled to no deference whatsoever because determinations of feasibility and availability are not matters within the agency's expertise. *See Bethlehem Steel Corp. v. EPA,* 723 F.2d 1303 (7th Cir.1983). Pyramid would have the court adopt the Corps' interpretation of the term "available." Although the Corps did not specifically address this issue, it did determine that:

> [F]rom the point of view of the applicant in this case, it appears that the North Attleboro site is not available. The north site is controlled by a competitor who has an interest in developing a regional shopping mall in the same trade area as the applicant.

B–14 at 1; SOF/EA, Views of the Chief of the Engineers at 1.

Moreover, the Corps' Statement of Findings and Environmental Assessment states:

> Is there an alternative ... not presently owned by the applicant, that can be reasonably obtained? *There is an alternative site available ... It is not available to these applicants, because it has been optioned by another mall developer.*

*Id.* at 16.

Thus, it appears that the Corps assumed that the alternatives were to be considered contemporaneously with the application.

Nevertheless, the court finds that the EPA's interpretation of the regulations was reasonable.

Assuming that the government's "market entry" approach to availability is reasonable, Pyramid claims that the record does not support the agency's finding of availability.

#### Support in Record

■ The record shows that the New England Development Company optioned the North Attleboro site on July 1, 1983. *See* FD at 22.[32] Pyramid did not purchase Sweden's Swamp until December 1983 and was not in the area until September of 1983. *See* Plaintiff's Reply Brief at 22. Thus, Pyramid concludes that the EPA

---

**32.** *See* B–109 (EPA memo); B–474; B–863; B– 226; B–455A; H–76.

could not reasonably infer from the record that it had "entered the market" prior to New England's gaining control of the property.

The EPA, however, asserts that its decision was based on evidence in the record. Although the largest parcel was under its control in July 1983, the site option acquisition was not completed until February 1984, after Pyramid acquired Sweden's Swamp in December 1983. *Id.* Pyramid has stated that it had the opportunity to purchase the North Attleboro property but declined to do so, B–888 (statement by Bersani in newspaper); B–107 (minutes of 4/3/85 meeting with Pyramid). Statements to this effect were contradicted, however, at a later time. B–42 at 9 (Bersani Affidavit) (site not available); B–504 at 4 (site not available after fall of 1983). In its supplement to its Section 404 application, dated October 1984, Pyramid states that "our ultimate [reason] for rejecting the North Attleboro I site was its location and therefore its market nonfeasibility." B–6 at 20. The supplemental application does not indicate whether the New England Development Co. would have sold the land to Pyramid in September of 1983, but Pyramid does state in that document, however, that "our competitor, State Properties of New England [New England Development Co], has spent little, if any, money on their attempt to develop this site. The current landowner, Allen Riley, is the primary financier of this effort. Mr. Riley is driven by a need and desire to rid himself of a vacant parcel with which he has been burdened for over five years." B–6 at 21.

Finally, the EPA simply did not believe Pyramid's assertion that it purchased the site in December 1983 after only eight weeks of investigation. FD at 22; *see* B–42 at 10. The EPA reached the conclusion that it would be customary to investigate a trade area for longer than eight weeks. FD at 22, n. 15. For example, Pyramid's predecessor, the Edward DeBartolo Corporation withdrew its plans to develop the area in March 1983. DeBartolo then contacted Pyramid. B–131. Pyramid, however, is correct in its assertion that the EPA has failed to cite any direct evidence pertaining to its conclusion that industry custom would support a finding that more than eight weeks are necessary to properly evaluate an area.

Nevertheless, the court finds that the record supports the EPA's finding that the North Attleboro site was available to Pyramid at the time it "entered the market" in September or December of 1983. This conclusion was not arbitrary.

Even assuming that the EPA reached an arbitrary decision regarding the availability of a practicable alternative, its Final Determination must be upheld as reasonable because it was based upon a rational, independent finding that a significant loss in wildlife resources would result from the construction of a mall at Sweden's Swamp.

**5. Adverse Effects**

Pyramid contends that the EPA failed to find that unacceptable adverse effects would flow from construction of the proposed mall, but instead based its conclusion solely on the fact that a practicable alternative existed. It claims that any findings of adverse effects are inextricably intertwined with the EPA's finding that these effects were avoidable. Pyramid concedes that proposed mitigation is relevant to determining the *net* environmental effect. *See* Plaintiffs' Reply Brief at 34 n. 29.

The Final Determination issued by the EPA clearly identifies the adverse effects of the project on the site's wildlife resources.[33] The decision makes the follow-

33. The intervenor-plaintiffs Citizens in Support of Attleboro Mall and Joseph Robichaud (CISA) contend that the EPA committed error by considering the effects of the proposed discharge on the "wildlife habitat" rather than on the "wildlife" because Section 404(c) refers to "wildlife." They also argue that a finding of adverse effects on wildlife or wildlife habitat must involve a specific adverse effect on **water quality.**

Assuming the legal correctness of the intervenor-plaintiffs' position, the administrative record does indicate that destruction of the existing wildlife habitat at Sweden's Swamp will adversely effect wildlife by driving away or killing animals currently living there; by reducing

ing findings. Sweden's Swamp provides an "excellent" habitat for migratory bird species and a variety of mammals and amphibians. FD at 7. Construction of mall at the swamp would eliminate or alter a substantial part of this habitat and result in a significant loss of existing wildlife habitat. FD at 7–9. Nesting species would be adversely affected and many mammals would retreat from or be killed during the construction. FD at 9–10. Many of the displaced species would perish. "The displacement would particularly adversely affect nesting species, such as the northern flicker, gray catbird, song sparrow and white-breasted nuthatch, and species which prefer forested wetlands, such as the red-shouldered hawk and the Kentucky warbler." FD at 10.

Moreover, the Final Determination dwelt extensively on the uncertainty surrounding the potential success of Pyramid's mitigation proposals. The Administrator determined that the proposed onsite mitigation, which contemplated the creation of emergent marsh, shrub swamp and open water from existing wooded wetlands, would have minimal value after the excavation and regrading. Furthermore, the degree of resettlement would be affected by the activity at the mall and these new wetlands would not buffer the wildlife from the disturbance of nearby highways as effectively as the existing wooded wetlands. The new wetlands would be substantially smaller and of a different type than those lost. FD at 10. The potential success of the offsite mitigation attempt was deemed uncertain. In this respect, Pyramid proposed that it create 36 acres of emergent wetlands, shrub swamp and open water at a location two miles from Sweden's Swamp. Even if successful, the net increase in habitat values at the offsite location would not compensate for those lost at the proposed shopping mall site. Additionally, the proposed

offsite and onsite wetlands would, if successful, provide habitat for a different species mix than that currently populating Sweden's Swamp.

Although the EPA went on to state that "in determining whether these adverse impacts are unacceptable, it is relevant to examine next the avoidability of this wetland loss by reviewing whether there are practicable, less environmentally damaging alternatives to the proposed project," it clearly did consider whether the proposed project would result in "significant loss of or damage to ... wildlife habitat." 40 C.F.R. 231.2(e). The regulations define an impact having this type of adverse effect as "unacceptable." Applying the definition urged by Pyramid, an effect is significant if it is "important, major or consequential." The Final Determination suggests that these losses are "substantial." At one point, the filling of the swamp is characterized as a "significant avoidable loss of wildlife habitat." Although the decision bases its finding of unacceptability, in part, on avoidability, it also considers the cumulative impact of similar losses and the nature of the loss in this particular context in reaching its decision. Thus, the EPA finally concluded that "the excellent value of the wildlife value of the wetland in question, its size and setting, the avoidability of the loss and the significance of such areas in Massachusetts" made the effects of the project "unacceptable." FD at 30.

Even assuming that the EPA arbitrarily considered and determined the practicable alternatives question, which it did not, the court finds that another independent and rational basis for its decision existed.

## CONCLUSION

For the reasons cited above, the court hereby grants the defendants' motion for

the buffer zone protecting wildlife from human-induced disturbances and by affecting the types of species which would use the area, particularly predatory birds. FD at 10–12; RD at 19–22; SOF/EA at 11–12.

Furthermore, Section 404 addresses broader concerns than traditional notions of water quality. Section 404(c) itself refers to wildlife and

recreation, thus, reflecting a broad congressional concern. There is absolutely no language in the statute or the implementing regulations which supports intervenor-plaintiffs' interpretation that a nexus between an effect on water quality and the adverse effects on wildlife or the wildlife habitat be demonstrated.

summary judgment and denies the plaintiffs' motion for summary judgment.

IT IS SO ORDERED.